**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAY 14 2003**

**PATRICK FISHER**
**Clerk**

PUBLISH

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

CHANI BROWN, individually, and as
guardian of her minor son, KELTON
BROWN,

Plaintiff-Appellant,

v.

No. 01-4226

SEARS, ROEBUCK & CO., a
New York corporation,

Defendant-Appellee.

---

## APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH
## (D.C. NO. 1:00-CV-4-B)

---

Peter W. Summerill (James R. Hasenyager, with him on the briefs), Ogden, Utah,
for Plaintiff-Appellant.

James M. Brogan of Piper Marbury Rudnick & Wolfe LLP, Philadelphia,
Pennsylvania (Nancy Shane Rappaport of Piper Marbury Rudnick & Wolfe LLP,
Philadelphia, Pennsylvania, and Tracy Fowler of Snell & Wilmer LLP, Salt Lake
City, Utah, with him on the brief), for Defendant-Appellee.

---

Before **TACHA,** Chief Judge, **HARTZ**, and **O'BRIEN**, Circuit Judges.

---

**HARTZ**, Circuit Judge.

This appeal concerns a product liability action governed by Utah law. Plaintiff Chani Brown sues individually and on behalf of her son, Kelton, who suffered injuries when he was backed over by a riding lawnmower. Plaintiff alleges that the lawnmower, sold by Defendant Sears, Roebuck & Company, was defective in design. She relies on strict liability and negligence theories. On September 26, 2001, the district court entered summary judgment in favor of Sears, finding that Plaintiff had presented insufficient evidence in support of her claims. Plaintiff appeals the district court's ruling. We exercise jurisdiction under 28 U.S.C. § 1291 and affirm.

I.     **Background**

The accident occurred on July 22, 1998, while Andrew McManus was using a Sears Craftsman lawn tractor. Just before Andrew began to mow his family's yard, his two-year-old nephew Kelton asked if he could ride on the tractor. Andrew declined to give him a ride. Andrew started mowing, and Kelton walked to a different area of the yard to play with some toys. Some time later, Kelton approached the tractor and again asked if he could go for a ride. Andrew replied, "No, go in the house." When Andrew resumed mowing the lawn, Kelton grew frustrated. He picked up grass clippings and threw them at Andrew whenever the tractor passed by him.

In the midst of mowing, Andrew noticed that he had failed to cut a patch of grass in an area he had just covered. He decided to back up the tractor in order to mow the grass he had missed. He checked behind his left and right shoulders and then shifted the mower into reverse. As he rode in reverse, he focused his attention downward at the discharge chute on the side of the mower. Andrew had been mowing backward for about five feet when Kelton's slipper flew out of the discharge chute. Andrew turned around to look for Kelton and saw that he was underneath the lawn mower, screaming. After turning the mower blades off, Andrew drove forward, off of Kelton. He stopped the tractor's engine, briefly examined Kelton, and then ran for help.

Kelton suffered injuries to his left leg and foot, resulting from contact with the rotating mower blades. His first and second toes were amputated, and he also received severe wounds on his left knee and lower thigh. Following the accident, Plaintiff filed a product liability suit against Sears, alleging that the lawnmower had a design defect resulting in her son's injuries.

William McManus, Andrew McManus's father, bought the four-wheeled lawn tractor at a Sears store in April 1997. Although Sears sells the product under the Sears Craftsman label, the company did not design or manufacture the product. Underneath the tractor, between the front and back wheels, is a mower deck containing two blades. The person operating the tractor can use a lever next

to the seat to raise and lower the mower deck, and a lever on the dashboard to engage and disengage the mower blades.

Central to Plaintiff's claims is the capacity of the tractor to operate in reverse while the mower blades are engaged. According to Plaintiff, allowing operators to mow in reverse exacerbates a well-known hazard associated with reverse travel on lawn tractors. When riding backwards, operators have difficulty seeing small children who are standing within two feet of the rear of the tractor. Plaintiff maintains that if a tractor backs into a child while the mower blades are rotating, the child sustains worse injuries than if the tractor backs into a child while the blades are turned off.

In Plaintiff's view, such backover blade-contact injuries are a preventable risk. A lawnmower can be equipped with a safety feature that keeps operators from traveling in reverse with the mower blades engaged. Plaintiff contends that this feature substantially reduces the chances that children will suffer blade-contact injuries in backover accidents. Plaintiff's complaint alleges that the absence of this safety feature rendered the riding lawnmower unreasonably dangerous.

Sears moved for summary judgment, arguing that Plaintiff was unable to satisfy the requirements for a strict products liability action. Under Utah's "consumer expectations" test, Sears maintained, Plaintiff would have to show that

the mower was more dangerous than an ordinary user would anticipate, and Plaintiff had failed to meet this burden. Plaintiff responded that her claim should not be assessed under a conventional consumer expectations test, because the injured party in this case was a bystander, rather than a user of the product. Plaintiff asserted that she had established a claim for strict products liability by showing that the risks of the mower's design outweighed the benefits of the design, and that the mower could have been made safer through the adoption of the alternative design she proposed.

The district court granted Sears' motion for summary judgment. In explaining its ruling, the district court cited several deficiencies in Plaintiff's case, including: (1) Sears provided clear warnings about the potential for accidents involving small children; (2) the accident was the fault of the operator; (3) Plaintiff's expert's testimony concerning safety devices that might have prevented the accident did not establish that the mower was defective in design; and (4) Plaintiff had failed to offer adequate proof that Kelton's injuries would have been less severe had the mower been equipped with a no-mow-in-reverse device.

Plaintiff appeals the summary judgment. Because this is a diversity case, we apply the substantive tort law of Utah. We follow federal law, however,

regarding the standard for granting summary judgment. *Eck v. Parke, Davis &*

*Co.*, 256 F.3d 1013, 1016 (10th Cir. 2001). Accordingly,

> [w]e review the entry of summary judgment de novo, drawing all
> reasonable inferences in favor of the nonmovants. The moving party
> must show there is no genuine issue as to any material fact and that it
> is entitled to judgment as a matter of law. The nonmovant must
> establish, at a minimum, an inference of the existence of each
> element essential to the case.

*Boykin v. ATC/VanCom of Colo., L.P.*, 247 F.3d 1061, 1063 (10th Cir. 2001)

(internal citations and quotation marks omitted).

## II.   **Discussion**

The Utah Supreme Court recently observed that "[a]lternative theories are

available to prove different categories of defective product, including negligence,

strict liability, or implied warranty of merchantability." *Bishop v. GenTec Inc.*,

48 P.3d 218, 225-26 (Utah 2002), *citing* Restatement (Third) of Torts: Products

Liability § 2 cmt. n (1997) (Restatement Third). In this case Plaintiff draws on

both strict liability and negligence theories in contending that the Sears Craftsman

lawn tractor contained a design defect. We address Plaintiff's strict liability

claim and then her negligence claim.

### A.   Strict liability

The law governing strict products liability in Utah has two sources: the

common law and a statute, Utah Code Ann. § 78-15-6. Although some reported

opinions refer to both sources, *see, e.g., Lamb v. B & B Amusements Corp.*, 869

P.2d 926, 929 (Utah 1993); *House v. Armour of Am., Inc.*, 886 P.2d 542, 547

(Utah Ct. App. 1994), the Utah courts have devoted virtually no attention to

examining the interrelationship between the statute and the common law.  In light

of the parties' arguments on appeal, that task cannot be avoided here.

We begin with the statute.  The Utah Product Liability Act, § 78-15-6,

provides:

> In any action for damages for personal injury, death, or property damage allegedly caused by a defect in a product:
>
> (1)  No product shall be considered to have a defect or to be in a defective condition, unless, at the time the product was sold by the manufacturer or other initial seller, there was a defect or defective condition in the product which made the product unreasonably dangerous to the user or consumer.
>
> (2) As used in this act, "unreasonably dangerous" means that the product was dangerous to an extent beyond which would be contemplated by the ordinary and prudent buyer, consumer or user of that product in that community considering the product's characteristics, propensities, risks, dangers and uses together with any actual knowledge, training, or experience possessed by that particular buyer, user or consumer.

Our first observation is a point not noted by the parties:  The statute does not

create a cause of action.  It sets limits on any cause of action created by some

other source of law.  It states that in a products liability suit, a product will be

regarded as defective only if at the time of sale the product was "unreasonably

dangerous," as defined by subsection (2) of the statute.  The statute thus imposes

a *necessary* condition for a cause of action.  The statute does not state what is

*sufficient* for a cause of action. Because Utah does not have another statute setting forth the elements of a products liability cause of action, the sufficient conditions for such a cause of action must come from the common law.

Utah first recognized a common-law cause of action for strict products liability in *Ernest W. Hahn, Inc., v. Armco Steel Co.*, 601 P.2d 152, 156-58 (Utah 1979). *Hahn* followed Restatement (Second) of Torts § 402A (1965) (Restatement Second), which states: "One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property," even if "the seller has exercised all possible care in the preparation and sale of his product." Utah has since applied "a three-part test" that a plaintiff must satisfy to sustain such a cause of action for strict products liability. *Burns v. Cannondale Bicycle Co.*, 876 P.2d 415, 418 (Utah Ct. App. 1994). "The plaintiff must show (1) that the product was unreasonably dangerous due to a defect or defective condition, (2) that the defect existed at the time the product was sold, and (3) that the defective condition was a cause of the plaintiff's injuries." *Id.* (citation and internal quotation marks omitted).

In this case the alleged defect is a design defect. Utah appellate courts have not had occasion to explain how to determine whether a product's design makes the product defective. *Cf. Grundberg v. Upjohn Co.*, 813 P.2d 89, 95

(Utah 1991) (rejecting a design-defect claim involving a prescription drug on the ground "that manufacturers of unavoidably dangerous products should not be liable for a claim of design defect"). This circuit, however, has interpreted Utah law to require that the plaintiff prove the practicability of a safer design. In *Allen v. Minnstar, Inc.*, 8 F.3d 1470, 1472 (10th Cir. 1993), the plaintiff had been badly hurt when he was run over by a boat and cut by the boat engine's propeller. The plaintiff maintained that the absence of a propeller guard on the boat constituted a design defect. *Id.* The district court granted summary judgment in favor of the engine manufacturer. We affirmed, stating that "the district judge properly held that a showing of an alternative, safer design, practicable under the circumstances and available at the time of defendants' placing the boat and engine in the stream of commerce . . . was required." *Id.* at 1479. This test is in essence a risk-utility balancing test, weighing the costs of an alternative design against its benefits. *See* Restatement Third § 2 cmt. d.

Plaintiff relies on this risk-utility test in making her claim against Sears. She contends that her evidence establishes that an alternative design for the mower—inclusion of the no-mow-in-reverse (NMIR) feature—would have lessened Kelton's injuries.

To prevail on her strict products liability claim, however, Plaintiff cannot just rely on the common law; she must also overcome the barrier posed by § 78-

15-6, which places limitations on her cause of action that may exceed those imposed under the common law. In particular, she must establish that the mower was "unreasonably dangerous," *i.e.*, that:

> the product was dangerous to an extent beyond which would be contemplated by the ordinary and prudent buyer, consumer or user of that product in that community considering the product's characteristics, propensities, risks, dangers and uses together with any actual knowledge, training, or experience possessed by that particular buyer, user or consumer.

§ 78-15-6(2).

The first part of this definition obviously derives from comment i of Restatement Second § 402A. Explaining the meaning of "unreasonably dangerous," the comment states: "The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." Comment i articulates an objective test. The state of mind of the product's actual user, or victim, is irrelevant. The issue, roughly speaking, is whether an ordinary person would think the product is less dangerous than it is. The test described in comment i is often labeled the "consumer expectations test."

Plaintiff contends, however, that this consumer expectations test is only one of three alternative tests found in the statute, and if any one of the three is satisfied, the product is unreasonably dangerous. In addition to the consumer expectations test, she argues, there is a risk-utility test, which looks to the

features of the product, and a third test that is based on the consumer's subjective

understanding of the product's risks.  She writes:

> The language of the Utah Statute rejects the notion that a
> single test may determine the existence of an unreasonably dangerous
> condition.  First, in defining 'unreasonably dangerous' the statute
> calls for consideration of whether 'the product was dangerous to an
> extent beyond [that] contemplated by the ordinary and prudent buyer,
> consumer or user of that product in that community.'  Second the
> statute implicates the 'product's characteristics, propensities, risks,
> dangers and uses.'  Finally, the statute imposes a subjective analysis
> of the individual 'knowledge, training, or experience possessed by
> that particular. . . consumer.'

Aplt. Br. at 9-10.

That is not how we read the statute.  Two of our disagreements with

Plaintiff's reading are dispositive.  One, we do not read the statute to create a

risk-utility test.  Two, we do not read the statute as creating alternative tests for

determining whether a product is unreasonably dangerous.  Rather, the tests are

cumulative; a product is not unreasonably dangerous unless *all* the statutory

requirements are satisfied.

Beginning with Plaintiff's argument that § 78-15-6(2) contains a risk-utility

test, we recognize that this court in *Allen* applied such a test under Utah law.  *See*

*Allen*, 8 F.3d at 1470.  But our decision in *Allen* did not purport to derive the risk-

utility test from the language of § 78-15-6(2)—in fact, the decision did not cite

the statute.  Instead, the court in *Allen* gleaned the test from the common law of

products liability.  *See also Endresen v. Scheels Hardware & Sports Shop, Inc.*,

-11-

560 N.W.2d 225, 233-35 (N.D. 1997) (applying risk-utility test under North Dakota law, which has a statutory provision similar to § 78-15-6(2), but not purporting to derive that test from the statute).

In any event, we cannot agree that the statutory language "considering the product's characteristics, propensities, risks, dangers and uses" creates a risk-utility test. The quoted clause must be read in context. The statutory definition of an "unreasonably dangerous" product is a product that

> was dangerous to an extent beyond which would be contemplated by the ordinary and prudent buyer, consumer or user of that product in that community *considering the product's characteristics, propensities, risks, dangers and uses . . . .*

§ 78-15-6(2) (emphasis added). Thus, the features of the product are to be considered only for the purpose of determining what would be contemplated by ordinary, prudent persons in the community. In contrast, a risk-utility analysis is concerned with the *actual* risks and benefits of the design, not what ordinary people may think. The pertinent evidence typically is what is known by *experts* (usually from outside the community) regarding both the safety of the product and alternative ways in which it could be designed. If the Utah legislature intended to create a risk-utility test, it chose remarkably obscure language to convey its intent.

To support her argument that she can prevail by satisfying the risk-utility test alone, Plaintiff points to one of the Model Utah Jury Instructions (MUJI). MUJI 12.5 states:

> A product is defective in design:
> 1. If it fails to perform as safely as an ordinary consumer or user would expect when used in an intended or reasonably foreseeable manner; *or*
> 2. If there is a risk of danger inherent in the design which outweighs the benefits of that design.

(emphasis added). The instruction goes on to list the factors relevant to a risk-benefit analysis, including "[t]he availability of a substitute product that would serve the same function but would not be as dangerous." MUJI 12.5(2)(4).

We are not bound, however, by the model instruction. The MUJI are not authoritative pronouncements by the Utah Supreme Court. They are prepared by a committee of lawyers and judges, and then adopted by the state's district court judges. Model Utah Jury Instructions: Civil, at iii-vii (1993). The Utah Supreme Court has said that "the MUJI are merely advisory and do not necessarily represent correct statements of Utah law." *Jones v. Cyprus Plateau Mining Corp.*, 944 P.2d 357, 359 (Utah 1997).

Nor do we find the MUJI persuasive, at least as support for the proposition that there are two independent methods of establishing a design defect. Although the authors of the MUJI cite a California case in support of the instruction, *see Barker v. Lull Eng'g Co.*, 573 P.2d 443 (Cal. 1978), they rely on no Utah decision as authority, nor have we found one.

This brings us to Plaintiff's contention that the statute provides an alternative *subjective* consumer expectations test—which depends on the state of

-13-

mind of a specific person, rather than that of a hypothetical "ordinary and prudent" person—for determining that a product is unreasonably dangerous. She points to the statutory language referring to "any *actual* knowledge, training, or experience possessed by *that particular* buyer, user or consumer." Aplt. Br. at 9. (emphasis added). She further asserts that the statute must be read to include the subjective expectations of an injured bystander, such as Kelton, as well as those of a "buyer, user or consumer," and then notes, unsurprisingly, that there is no evidence that two-year-old Kelton appreciated the lawnmower's danger. According to Plaintiff, if the product is unreasonably unsafe under the subjective test, then the statute is satisfied, regardless of whether the objective test is met.

Plaintiff is certainly correct in contending that the quoted language creates a subjective test. For discussion, we will even assume that Plaintiff is correct in arguing that the statute's subjective test requires looking at the state of mind of the victim, even if the victim, as in this case, was not a buyer, user, or consumer. We must part company with Plaintiff, however, on her contention that the subjective test set forth at the end of subsection (2) is an *alternative* to the objective test set forth earlier in the subsection.

We are unable to construe the statute as providing alternative tests. Section 78-15-6(2) states that to be "unreasonably dangerous," a product must be more dangerous than "contemplated by the ordinary and prudent" person, "considering

the product's characteristics, propensities, risk, dangers and uses *together with* any actual knowledge, training, or experience possessed by that particular buyer, user or consumer." (Emphasis added.) The words "together with" do not signal that the items considered together are alternatives. Even recognizing that the statute is not written as clearly as it might be (for example, the statute does not identify who is the "particular" buyer, user, or consumer, although it can be inferred that the person in mind is the person injured by the product), we must read "together with" as conveying cumulation. Under subsection (2) a product is "unreasonably dangerous" if its actual dangers exceed its perceived dangers. The words "together with" indicate that there are two components to the product's perceived dangers: (1) an ordinary person's understanding of the product, "*together with*" (2) the understanding possessed by the particular person. Again, if the Utah legislature wished to state that a product is unreasonably dangerous simply if, among other possibilities, the product is more dangerous than was contemplated by the victim, then the legislature picked a peculiar way to convey that point.

Furthermore, Plaintiff's reading of § 78-15-6(2) has the absurd consequence of making every product potentially "unreasonably dangerous." Whenever the person injured by a product is a young child, Plaintiff would look

to whether the product is more dangerous than the child would contemplate. By this standard a kitchen knife or folding chair would be unreasonably dangerous.

In short, we read § 78-15-6(2) as imposing an objective consumer expectations test and supplementing it with a subjective test based on the individual knowledge, training, and experience of the particular buyer, user, consumer, or, possibly, victim. Such individual information regarding the product would ordinarily increase the particular person's appreciation of the product's danger. Hence, if a product is not "unreasonably dangerous" under the statute's objective test, it is not necessary to consider the subjective information of the "particular" person. That information can only work against a plaintiff's claim that a product is unreasonably dangerous because it increases the extent of the perceived danger beyond that contemplated by the ordinary and prudent person.

Turning to the facts of the present case, Sears must prevail on the strict products liability claim because Plaintiff's evidence fails to satisfy the objective test in § 78-15-6(2). An ordinary and prudent user of the mower would have appreciated the danger arising from the operation of the mower blades while the tractor was moving in reverse. Plaintiff did not argue otherwise at the district court hearing on Sears' motion for summary judgment, nor has she done so in her briefs on appeal.

We therefore affirm the district court's judgment in favor of Sears on the strict-products-liability claim.

B.     Negligence

Having disposed of Plaintiff's strict liability claim, we can readily dispose of her negligence claim as well.  In *Slisze v. Stanley-Bostitch*, 979 P.2d 317, 319 (Utah 1999), the Utah Supreme Court held that "it is . . . possible to simultaneously bring a negligence and a strict liability claim" involving a product. *Cf. Alder v. Bayer Corp.*, 61 P.3d 1068, 1076 (Utah 2002) (claim for negligent installation and maintenance of product).  But the court refused to recognize a duty "to refrain from marketing a non-defective product when a safer model is available." *Slisze*, 979 P.2d at 320.  In so holding, the court clearly was using the same meaning of "defective" as in strict liability claims. *See id.* at 321  ("[I]f the product were to be determined defective, recovery under the strict products liability statute would be sufficient to compensate plaintiff, making a negligence claim superfluous.").

In presenting her common-law-negligence claim, Plaintiff argues that (1) mowers capable of being operated in reverse pose a risk of severe injuries to children; (2) the lawnmower industry in general, and Sears in particular, knew of this risk; and (3) instead of taking appropriate action to reduce this risk, Sears continued to distribute mowers that did not contain an NMIR feature.  This claim,

however, amounts to no more than an argument that even if the riding mower was not defective under § 78-15-6(2), it was nevertheless negligent of Sears to market it because an alternative safer design was available. Thus, the claim is barred by *Slisze*. Plaintiff's arguments might well be persuasive under a different test for determining whether a product is defectively designed, *see* Restatement Third § 2 cmt. f; but our task here is to follow Utah law, and we are bound by § 78-15-6(2).

III.   **Conclusion**

We **AFFIRM** the district court's entry of summary judgment in favor of Sears. Because we affirm the summary judgment, we need not address Plaintiff's argument that the case should be reassigned to a different judge on remand.