**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**September 21, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

MICHAEL A. HENRIE,

        Plaintiff - Appellant,

v.

NORTHROP GRUMMAN
CORPORATION, formerly known as
Northrop Corporation; NORTHROP
GRUMMAN SYSTEMS; NORTHROP
GRUMMAN INFORMATION
TECHNOLOGY, INC.,

        Defendants - Appellees.

No. 06-4102

---

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 2:04-CV-296-PGC)**

---

Douglas B. Cannon of Fabian & Clendenin, Salt Lake City, Utah, for Plaintiff -
Appellant.

Ryan M. Harris (J. Angus Edwards with him on the briefs) of Jones, Waldo,
Holbrook & McDonough  Salt Lake City, Utah, for Defendants - Appellants.

---

Before **O'BRIEN, BALDOCK** and **HOLMES**, Circuit Judges.

---

**O'BRIEN**, Circuit Judge.

---

Michael Henrie severely injured his arm while working at Hill Air Force Base (Hill Field) using an apparatus to hold large, heavy parts for painting. He filed a products liability claim against Northrop Grumman Corporation (NGC), the manufacturer of the apparatus. The district court granted summary judgment in favor of NGC. Henrie appealed. We affirm.

## I. Background

Henrie is an experienced professional civilian painter who had worked for the military at Hill Field for twenty-three years. On July 19, 2001, while painting B2 Stealth Bomber parts, Henrie injured his arm and shoulder using a device known as a "glass fixture." (R. Vol. I 318, 344-348). The glass fixture is the largest of eleven different fixtures, each designed to hold a different part of the aircraft during the application of paint or another coating. It is comprised of two square frames, one which rotates within the other, somewhat like a gyroscope. The frames are attached to a wheeled base. The fixture is used as follows: The workers place the inner frame of the fixture in a horizontal position. The frame position is secured with two pins, one located on each side of the frame. Once the aircraft part is loaded on the frame and clamped, two persons standing on the wheel base to each side of the fixture remove the pins while several others hold the frame and then move it to a vertical position. The pins are reinserted when the frame (and the aircraft part) reach the vertical position. After completing work on the part, the process is reversed. Two men pull the pins while several

-2-

others hold the frame to prevent uncontrolled rotation of the heavily weighted end of the part.[1] The aircraft part is then packaged for shipping.

Prior to the accident, Henrie had been working in the B2 program for approximately a year and a half. The painting department employed seven or eight employees. Henrie's first contact with the fixtures was at NGC's California B2 manufacturing plant located on the Pico Rivera Air Force Base (Pico). Henrie and another painter were sent for thirty days of observation training in February 1999. In April or May 1999, he and two other employees were again sent to Pico for six weeks of training. Finally, in late 1999, he returned to Pico for a month to do production work. At Pico, the frame devices ran on monorails. The Air Force requested Northrop Grumman to modify the frames to fit on a wheeled base for use at Hill Field after Pico closed in early 2000. The devices were designed solely for use by the painters at Hill Field.

Henrie testified he and a fellow worker established the frame procedure after the fixtures arrived at Hill Field without instructions. *See* pp. 1-2 *supra* (use of fixture). Henrie and the other painters used the various fixtures every day after the equipment arrived at Hill Field up to the day of the accident. Four or five months before the accident, the Air Force modified the glass fixture. Henrie and his co-workers reported a swivel which allowed the aircraft part to rotate within inner frame which caused them safety concerns. At their request, the swivel was

---

[1] The parts may weigh many hundreds of pounds.

welded solid.

On July 19, 2001, Henrie's supervisor assigned him and fellow employee, Isaac Donohue, to unload the glass from the fixture and package it for shipping. The two men went to each side of the fixture and stood on the base to release the pins. Henrie then called out to others in the area for assistance in lowering the part and frame to the horizontal position. As he looked over his shoulder, Henrie saw "a bunch of people" standing behind him. (R. Vol. 1 at 328.) He mistakenly assumed they were there to assist with the frame and yelled to Donohue to pull the pin. Both men released the pins simultaneously. When Henrie turned to help with the frame, the weighted side of the frame spun down and caught his arm. Donohue was knocked off the fixture base. Henrie fractured his elbow and dislocated his shoulder, eventually requiring several surgeries.

On June 13, 2003, Henrie filed his claim against NGC alleging (1) strict product liability for the design and manufacture of an unreasonably dangerous product, (2) negligent design, testing, manufacture and distribution, and (3) breach of an implied warranty of merchantability and fitness. On January 14, 2005, NGC filed a Motion for Summary Judgment on all claims, contending the device worked exactly as designed and was not unreasonably dangerous. The district court deferred consideration of the motion until the completion of discovery.

After discovery, NGC renewed its motion for summary judgment. In

-4-

response, Henrie offered a report from his expert, Dr. Eberhard Bramberg, opining the painting device was defective because it unnecessarily placed the workers in the rotational path of the device and the hazard could have been easily eliminated by placing the rotation points around the part's center of gravity and/or by installing a worm gear drive.[2] In Bramberg's opinion NGC also failed to follow basic hazard analysis in the design and manufacture of the product.

On April 24, 2006, the district court granted summary judgment in favor of NGC. It determined, under Utah law, a plaintiff must meet both an objective and subjective test to demonstrate the product was unreasonably dangerous, the first element of a strict products liability claim. Relying on *Brown v. Sears, Roebuck & Co.*, the court determined the fixture was unreasonably dangerous under an objective test. 328 F.3d 1274 (10th Cir. 2003). However, because Henrie's experience and training gave him knowledge of the precise danger that caused his injury, the court concluded he could not show the product was unreasonably dangerous *to him*. The district court then determined Henrie's negligence and implied warranty claims must fail for the same reason. It granted summary judgment in favor of NGC on all claims.

On appeal, Henrie argues the district court incorrectly applied Utah law

---

[2] Dr. Bramberg proposed both the relocation of the rotation points to the airplane part's center of gravity and installing a worm gear box with a crank to the side of the device. With these features, the worker must turn the crank approximately twenty-five times to move the piece from the horizontal to a vertical position. (R. Vol. II at 468.)

because there was an economically reasonable alternative to prevent the design defect, and therefore, his knowledge of the defect does not defeat his claim. As his second issue, Henrie claims to have presented sufficient evidence to create a material issue of fact as to whether NGC negligently failed to engage in a basic hazard analysis.

## II. Discussion

We review the district court's grant of summary judgment de novo, construing all facts and reasonable inferences in the light most favorable to Henrie. *See Allen v. Minnstar, Inc*, 8 F.3d 1470, 1476 (10th Cir. 1993) (internal citations omitted). Summary judgment is proper only if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "In diversity cases our role is to ascertain and apply the proper state law, here that of Utah, with the goal of insuring that the result obtained is the one that would have been reached in the state courts. We review *de novo* the district court's rulings with respect to state law." *Allen*, 8 F.3d at 1476 (citations omitted).

At issue here is the interpretation of Utah Code Ann. § 78-15-6, a part of the Utah Products Liability Act. Normally, "the federal court must defer to the most recent decisions of the state's highest court." *Wankier v. Crown Equip. Corp.*, 353 F.3d 862, 866 (10th Cir. 2003). However, "where no controlling state decision exists, the federal court must attempt to predict what the state's highest

court would do . . . . bound by ordinary principles of *stare decisis.*" *Id.* "Thus,

when a panel of this Court has rendered a decision interpreting state law, that

interpretation is binding on district courts in this circuit, and on subsequent panels

of this Court, unless an intervening decision of the state's highest court has

resolved the issue." *Id.*

A. Strict Products Liability

Henrie contends the district court erroneously applied Utah Code Ann.

§ 78-15-6, a part of the Utah Products Liability Act. This provision states in

relevant part:

> **78-15-6. Defect or defective condition making product unreasonably dangerous--Rebuttable presumption**
>
> In any action for damages for personal injury, death, or property damage allegedly caused by a defect in a product:
>
> (1) No product shall be considered to have a defect or to be in a defective condition, unless at the time the product was sold by the manufacturer or other initial seller, there was a defect or defective condition in the product which made the product unreasonably dangerous to the user or consumer.
>
> (2) As used in this act, "unreasonably dangerous" means that the product was dangerous to an extent beyond which would be contemplated by the ordinary and prudent buyer, consumer or user of that product in that community considering the product's characteristics, propensities, risks, dangers and uses together with any actual knowledge, training, or experience possessed by that particular buyer, user or consumer.

Despite the language in subsection (2) of the statute, Henrie argued his

knowledge of the defect does not bar his claim if he can show the defect could be

economically and practically eliminated. Relying on *Brown v. Sears*, the district court disagreed.

In *Brown*, the plaintiff alleged a riding lawnmower was unreasonably dangerous in the absence of an automatic blade shut-down when the mower was operated in reverse. *Brown*, 328 F.3d at 1277. The plaintiff sought recovery under theories of strict liability and negligence. Addressing strict liability, we noted, "[t]he law governing strict products liability in Utah has two sources: the common law and a statute, Utah Code Ann. § 78-15-6. Although some reported opinions refer to both sources, the Utah courts have devoted virtually no attention to examining the interrelationship between the statute and the common law." *Id*. at 1278. In our review of the statute we stated:

> Section 78-15-6(2) states that to be "unreasonably dangerous," a product must be more dangerous than "contemplated by the ordinary and prudent" person, "considering the product's characteristics, propensities, risk, dangers and uses *together with* any actual knowledge, training, or experience possessed by that particular buyer, user or consumer." . . . The words "together with" do not signal that the items considered together are alternatives. . . . [W]e must read "together with" as conveying cumulation. Under subsection (2) a product is "unreasonably dangerous" if its actual dangers exceed its perceived dangers. The words "together with" indicate that there are two components to the product's perceived dangers: (1) an ordinary person's understanding of the product, "*together with*" (2) the understanding possessed by the particular person.

*Id*. at 1282. We concluded § 78-15-6(2) imposes "an objective consumer expectations test" supplemented by "a subjective test based on the individual knowledge, training, and experience of the particular buyer, user, consumer, or,

-8-

possibly, victim." *Id*. Because "individual information regarding the product would ordinarily increase the particular person's appreciation of the product's danger," the subjective test "increases the extent of the perceived danger beyond that contemplated by the ordinary and prudent person." *Id*.

Applying these principles to Henrie's strict liability claim, the district court determined the painting device failed the objective test (it was unreasonably dangerous to the ordinary user). However, given Henrie's extensive training on and knowledge of the fixtures, the glass fixture was not unreasonably dangerous under the subjective test. Henrie now argues *Brown* does not apply, and if it does, it should be overruled.

To demonstrate *Brown* is in conflict with Utah law, Henrie relies primarily on *House v. Armour of America, Inc.*, 886 P.2d 542, 548 (Utah Ct. App. 1994) (*House I*) where the Utah Court of Appeals held "the presence of an 'open and obvious' danger is merely one factor for the trier of fact to consider when assessing the liability of the defendant in a strict liability case -- it does not operate as a complete bar to the injured party's recovery." In *House v. Armour of America, Inc*, 929 P.2d 340 (Utah 1996) (*House II*) the Utah Supreme Court clarified this holding, concluding the obviousness of an inherent danger in a product can act as a complete bar to a products liability action if the danger cannot be economically alleviated. *Id*. at 344. Henrie also points to *Mulherin v. Ingersoll-Rand Co.,* 628 P.2d 1301 (Utah 1981), where the Utah Supreme Court

announced that the comparative fault principles enunciated in Utah Code Ann. § 78-27-38 applied with equal force in strict product liability actions. He maintains the application of comparative fault combined with his evidence of a safer design indicates the Utah courts would not bar his claim even though he knew of the fixture's danger.

Contrary to Henrie's contentions, however, none of these decisions negate the need for a plaintiff to meet the statutory definition of an "unreasonably dangerous" product to succeed on a strict liability claim. While we agree with the ultimate conclusion of the district court that Henrie failed to show a necessary element of his claim, the district court did not need to reach the subjective test.[3] *See Gomes v. Wood*, 451 F.3d 1122, 1133-34 (10th Cir.) ("This Court may affirm the district court on any ground adequately supported by the record so long as the parties have had a fair opportunity to address that ground."), *cert. denied*, 127 S.Ct. 676 (2006). Henrie failed to demonstrate a defective product under the objective consumer test, the first part of Utah's two-part test.

The district court determined the fixture was unreasonably dangerous under the objective consumer test solely on Henrie's evidence of a safer and economical alternative design. Although this evidence is an essential part of his claim, by itself it is not enough. For example, in *Brown*, the plaintiff's production of an

---

[3] The parties fully briefed both the objective and subjective tests to the district court.

expert report proposing a safer design could not save his strict liability claim in the absence of a product defect. *See Brown*, 328 F.3d at 1279, 1282-83. In addition to a safer alternative design, Henrie must show "the product was dangerous to an extent beyond which would be contemplated by the ordinary and prudent buyer, consumer or user of that product in that community." Utah Code Ann. § 78-15-6(2). This sentence is more fully explained in comment g, Restatement (Second) Torts § 402A,[4] which considers a defective condition to be present "only where the product is, at the time it leaves the seller's hands, in a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him." Further, comment I states, "Unreasonably dangerous" means "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics."

In *House II*, the Utah Supreme Court recognized the "sophisticated user" may be the "community" for which a product is designed. There, the defendant argued a police officer could not bring a products liability claim against the manufacturer of body armor because the police officer was part of a highly trained community. The court stated:

> As the court of appeals noted, defendants need not show that Lt. House actually knew about the danger but that the "community" to

---

[4] Utah adopted Restatement (Second) of Torts § 402A in *Ernest W. Hahn, Inc., v. Armco Steel Co.,* 601 P.2d 152, 156-58 (Utah 1979).

> which Lt. House belongs "generally knows" about the danger . . . . In other words, to sustain a conclusion that no duty was owed to the user because of his professional status, the court must "find the record evidence to be undisputed that the user actually knew of the danger or that, based on the user's special expertise and the circumstances of the transaction, the supplier reasonably could have believed that he knew of the danger."

*House*, 929 P.2d at 345 (citations omitted); *see also Gaines-Tabb v. ICI Explosives, USA, Inc.*, 160 F.3d 613, 624 (10th Cir. 1998) (applying Oklahoma law) (The consumer was a farmer and there was no indication the ammonium nitrate was less safe than expected by farmers.); *Lamer v. McKee Indus., Inc.*, 721 P.2d 611 (Alaska 1986) (The ordinary consumer was the professional garage door repairman and a number of experienced repairmen testified product failure was a surprise.); *Rojas v. Lindsay Mfg. Co.*, 701 P.2d 210 (Idaho 1985) (The ordinary user with ordinary knowledge common to the community would be, for purposes of this case, a farmer or a qualified maintenance person.). Here, Henrie and the other painters were similarly members of a small, professional group of painters well-acquainted with the equipment at issue here.

The uncontradicted evidence reveals NGC manufactured and designed eleven fixtures specifically for use by the professional painters at Hill Field. The record reveals no other use or contemplated use for the equipment. All the painters regularly used the equipment and Henrie does not argue the other painters working at Hill Field were not fully aware, as he was, of the danger if the pins were pulled without sufficient manpower to control the aircraft part's

-12-

descent. Indeed, there had been no other incidents where a part "spun out of control" nor were any injuries caused by the fixtures when used in the normal manner, despite their daily use, until the date of Henrie's injury. Thus, there was no defect beyond what this unique community of users, the B2 Stealth Bomber painters, contemplated. Because Henrie did not establish the fixture was an unreasonably dangerous product under the objective test, there was no need for the district court to apply the supplemental inquiry.[5]

As his final argument, Henrie claims Utah's policy supporting its strict liability statutes requires us to ignore the statutory definition of unreasonably

---

[5] To the extent our decision in *Beacham v. Lee-Norse*, 714 F.2d 1010 (10th Cir. 1983), applies to Henrie's argument, the instant facts distinguish this case. In *Beacham*, we considered whether subjective evidence, including the plaintiff's training and experience, was relevant to show the product was not unreasonably dangerous. *Id*. at 1015-16. Noting Utah's statutory definition of unreasonably dangerous, we stated:

> The statutory definition only lists factors to be considered in determining whether a product is unreasonably dangerous. Where a user encounters the defect involuntarily because a safety device was not provided, evidence of his actual knowledge, training, or experience is of only limited value: We have difficulty seeing how the knowledge of the dangerousness can alleviate the dangerous condition inasmuch as the performance by plaintiff of *his assigned tasks subjected him to injury regardless of the care exercised*.

*Id*. (emphasis added) (internal quotation and citation omitted). Here, prior requests leading to modification of the fixtures demonstrate Henrie did not have to work with his equipment in an "as is" condition. In addition, Henrie contributed to the creation of the procedures for working with the fixtures. Thus, unlike *Beacham*, Henrie cannot show his work with the fixture in its condition at the time of the accident was involuntary.

dangerous in the presence of an economical alternative design. *See Berry v.*

*Beech Aircraft*, 717 P.2d 670, 673 (Utah 1985) ("[T]he effect of strict liability has

no doubt been to encourage safer manufacturing practices and product designs,

thereby reducing the incidence of death and injury."). According to Henrie, if the

statutory definition bars his claim, manufacturers in Utah would be encouraged to

offer obviously dangerous products rather than safer products. In addition, a

manufacturer could avoid liability no matter how poorly the product is designed

so long as the danger is obvious. To prove his point he posits several extreme

examples.[6] While we question the marketability of some of his hypothetical

products, his argument should be directed elsewhere. The Utah legislature chose

to define the term "unreasonably dangerous" for the purpose of products liability

in Utah. As the Utah Supreme Court has observed, it is the Utah legislature who

must "change and modify the law that governs relations between individuals as

society evolves and conditions require." *Berry*, 717 P.2d at 676. It is not our role

to rewrite the Utah statute. The glass fixture was not "dangerous to an extent

beyond which would be contemplated by the ordinary and prudent buyer,

consumer or user in that community." Utah Code Ann. § 78-15-6(2).

B.  Negligence Claim

---

[6] Henrie argues, "under the district court's decision, . . . [k]nives can be stuck in dashboards[,] [s]eatbelts removed from cars[,] [e]lectrical wiring can be left exposed [and] [t]oys may be made with razor sharp edges." (Appellant's Br. at 24.)

-14-

The district court parsed Henrie's design negligence claim into two separate allegations: NGC was negligent in failing to 1) "install a safety mechanism" and 2) conduct a hazard analysis when designing the fixture. (Dist. Court Order at 15.) As to the first allegation, the district court concluded NGC did not owe a duty to refrain from marketing a non-defective product when a safer model is available, relying on the Utah Supreme Court's holding is *Slisze v. Stanley-Bostitch*, 979 P.2d 317, 321 (Utah 1999). The court determined Henrie's second allegation must fail because his only evidence of NGC's failure to conduct a hazard analysis was his expert's conclusion to that effect based solely on observation of the fixture. Henrie argues the district court was wrong on both counts.

In *Slisze*, the plaintiff was injured when a co-worker, using a "contact trip nailer"[7] tried to "toe-nail" two boards and the nail ricocheted into the plaintiff's head. He brought a claim based on strict liability as well as negligence. During the trial, the court admitted OSHA standards to show compliance with "government standards," creating a rebuttable presumption of non-defectiveness

---

[7] A 'contact-trip' model "allows its operator to discharge nails regardless of whether the operator first pulls the gun's trigger or depresses the nailer's nose contact element, as long as both are used. The 'sequential-trip' model, on the other hand, also manufactured and sold by Stanley, requires that the nose contact element be depressed first and the trigger pulled second for the nail to be discharged. The 'sequential-trip' mechanism makes it more difficult for nails to be discharged unintentionally and is generally considered to be safer." *Id*. at 318-19.

under Utah Code Ann. § 78-15-6(3). While the Utah Supreme Court recognized a plaintiff may jointly bring a strict liability and negligence claim, it found Slisze had failed to establish any duty, a necessary predicate in a negligence claim. *Slisze*, 979 P.2d at 319-20. The court concluded "[T]here is no duty to make a safe [product] safer" and no duty to warn because the alleged danger of the nailer was open and obvious." *Id*. at 320.

Henrie argues *Slisze* is inapplicable because the focus of his claim is on NGC's conduct and knowledge, not the characteristics of the product. He maintains Bramberg's evidence established a standard of care requiring a manufacturer to conduct a hazard analysis to enable the manufacturer to "eliminate the danger; guard against the danger; and warn against the danger." (Appellant's Br. at 32.) NGC's engineer acknowledged NGC had not conducted any hazard analysis in designing and building the device. According to Bramberg, had it done so, NGC would have identified its painting device as inherently unstable and would have been able to eliminate that danger both easily and economically. Henrie reasons that because Utah's strict liability statutes do not affect common law negligence claims, the "open and obvious" character of the defect should not bar his negligence claim. It should merely be a factor for consideration "when determining the comparative fault of both parties." *House*, 886 P.2d at 548; *see also Misener v. Gen. Motors*, 924 F. Supp. 130, 131-32 (D. Utah 1996) (citing *Dansie v. Anderson Lumber Co.*, 878 P.2d 1155, 1159 (Utah

Ct. App. 1994) (claims for negligence are not governed by the Products Liability Act).

"It is clear that in negligence cases, a designer has a 'duty to design its product so as to eliminate any *unreasonable* risk of foreseeable injury.'" *Hunt v. EST Eng'g, Inc.*, 808 P.2d 1137, 1139 (Utah App. 1991) (emphasis added). Restatement (Second) of Torts § 398 (1965), cited in *Hunt*, provides:

> A manufacturer of a chattel made under a plan or design which makes it dangerous for the uses for which it is manufactured is subject to liability to others whom he should expect to use the chattel or to be endangered by its probable use for physical harm caused by his failure to exercise reasonable care in the adoption of a safe plan or design.

*Id.* Henrie correctly notes NGC admitted it did not conduct a hazard analysis, an admission the district court failed to recognize. But that does not change the outcome.

The Utah courts have spoken to the duty of a manufacturer in a negligence claim. In *Slisze*, the court applied the Utah test for determining whether a duty exists for the purposes of negligence claim. *Slisze*, 979 P.2d at 320 (applying the test in *AMS Salt Indus., Inc. v. Magnesium Corp. of Am.*, 942 P.2d 315 (Utah 1997)).[8] The court was "not persuaded that it is necessary or wise to recognize a

---

[8] The Supreme Court reached this conclusion after weighing the factors set out in *AMS*. *Slisze*, 979 P.2d at 320. In *AMS*, the Utah Supreme Court set out the following factors to consider when imposing a duty sufficient to sustain a claim of negligence:

Whether the law imposes a duty does not depend upon foreseeability

-17-

duty requiring manufacturers to discontinue manufacturing less safe but non-defective products" because there had been "no showing that the likelihood of injury would be reduced enough to outweigh the costs and burdens of discontinuation." *Id.* While Henrie recognizes Utah has determined "there is no duty [in a negligence claim] to make a safe product safer," his argument relies on the premise that the definition found in Utah's strict products liability statute cannot be transferred to a negligence action for the purpose of determining whether a product is safe. However, that was precisely the method employed in *Mather v. Caterpillar Tractor Corporation*, 533 P.2d 717, 719 (Ariz. Ct. App. 1975), cited with approval in *Slisze*. In *Mather*, the Arizona Court of Appeals stated when "the underlying theories as to both negligence and strict liability were the same, to-wit, defective design . . . In both instances appellant had to prove that the [product] was in a defective condition and unreasonably dangerous." *Id*. Utah has defined defective condition and unreasonably dangerous for general purposes in its objective test for strict liability.[9] The overlap between an

> alone. The likelihood of injury, the magnitude of the burden of guarding against it and the consequences of placing that burden upon defendant, must also be taken into account. A duty may also be found on the basis of reasonable mutual reliance, voluntary conduct which increases the risk of harm, and general policy considerations.

*AMS*, 942 P.2d at 321 (internal citations and quotations omitted).

[9] We recognize the district court applied the second, individualized prong to determine the product was not unreasonably dangerous and Henrie's argument on appeal addresses the issues associated with the application of the subjective

unreasonably safe design and a negligent design has been recognized by other courts as well. *See Golonka v. Gen. Motors Corp.,* 65 P.3d 956, 964 (Ariz. Ct. App. 2003) ("By finding GM not at fault for strict liability design defect, the jury necessarily concluded that it would have been reasonable for a manufacturer to have placed GM's transmission into the stream of commerce."). As a result, because there is no duty to make a safe product safer and because the fixture was not defective under the consumer expectation test in § 78-15-6, the district court correctly granted summary judgment in favor of NGC.

**AFFIRMED**.

---

prong to a negligence claim. However, we need not reach the second subjective analysis in this case and do not express an opinion whether a different result would obtain under the subjective test.