**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 23, 2010**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

CATHERINE HERROD; ALAN
PARKINSON as guardian ad litem for
Scott Herrod, Taylor Herrod, Matthew
Herrod, and Elizabeth Herrod, minors;
NILES HERROD; JANET HERROD,

    Plaintiffs - Appellants,

v.

METAL POWDER PRODUCTS;
TIMPTE, INC., a Delaware company;
TIMPTE INDUSTRIES, INC.;
STEMCO, L.P., a Texas corporation,

    Defendants - Appellees.

No. 09-4175
(D.C. No. 1:07-CV-00023-TS)
(D. Utah)

**ORDER AND JUDGMENT**[*]

Before **KELLY**, **EBEL**, and **HOLMES**, Circuit Judges.

In 2005, a wheel assembly separated from the trailer of a truck traveling on

Interstate 15 in Davis County, Utah, bounced over the center cement divider, and

crashed into a car driven by Kimball Herrod, who died as a result of his injuries.

Mr. Herrod's wife and children were passengers. Following the accident, the

---

[*] This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

Utah Highway patrol found the wheel assembly with a Pro Torq spindle nut inside. Aplt. App. 870. The family filed suit alleging strict products liability and negligence against various defendants. The district court granted summary judgment in favor of Defendants-Appellees Metal Powder Products ("MPP"), Timpte, Inc., and Stemco, L.P. This appeal followed. Our jurisdiction in this diversity case arises under 28 U.S.C. § 1291, and we affirm in part, reverse in part, and remand.

Background

The Pro Torq system is used in the trucking industry to secure wheel bearings. In most instances, wheel assemblies in the commercial trucking industry are secured by use of a double nut system. Aplt. App. 1173. By contrast, the Pro-Torq system consists of one nut and a keeper. Id. at 315. The share of Pro-Torq in the market for axle retention systems has consistently been less than one percent. Id. at 832.

To install the system, the nut is threaded onto the axle to hold the hub assembly and the trailer wheels in place, then the keeper is placed inside the nut to prevent the nut from spinning and unthreading off the axle. Id. at 315. The keeper has teeth on its outer edge that interlock with corresponding teeth in a groove on the inside of the nut, which is the means by which the nut is locked in place. Id. The keeper also interlocks with the axle: the tab on the keeper is

- 2 -

inserted into a groove cut into the top of the axle, called the keyway.  Id.  The alleged defect in this instance pertains to the mechanism by which the keeper interlocks with the groove on the nut.  Aplt. Br. 21.

The semi-trailer involved in the subject accident was manufactured by Defendant Timpte Industries.  The trailer was manufactured with the Pro-Torq system at the request of the purchasing customer.  Timpte Br. 4; Aplt. App. 1270. The precise date of the subject nut's manufacture is unknown by the parties, but the part number is consistent with those manufactured by MPP prior to 1989. Aplt. App. 298.  For the purpose of its summary judgment motion, MPP assumed it manufactured the subject parts.  Id. at 869.  Likewise, Timpte does not dispute that it sold the semi-trailer containing the subject parts.  Timpte. Br. 5.

There are two main distribution channels for the Pro-Torq Nuts (PTNs): regional service centers/parts dealers and original equipment manufacturers (OEMs).  Aplt. App. 835.  Dealer training is an important component of marketing the Pro-Torq Spindle Nut.  See id. at 834-35 ("[O]ne of the reasons for slower growth of sales for the PTNs is that not everyone in the heavy duty trucking industry feels comfortable with changing to a new product.  The factories of OEMs may easily train their employees regarding the proper installation of the Pro-Torq Nuts but if the field service or dealers do not know how to re-install it, then it can cause problems. . . . The process of dealer training should be an on-going process.  Although, dealer training is not the most

important promotion activity for Pro-Torq Nut, it should not be ignored as it will help sell the product and avoid liability concerns in the long run.").

A factual dispute remains regarding whether the keeper found by the Utah Highway Patrol following the accident was properly seated inside the nut. Defendants contend and rely upon evidence tending to show that the keeper was found properly seated inside the nut and, therefore, Plaintiffs' product-defect claims should fail because foreseeable misinstallation, the alleged design defect, did not cause the accident. Id. at 870. Plaintiffs contend and also rely upon contrary evidence that the keeper was not installed correctly and that it likely snapped into place during the wheel separation. Aplt. Br. 9; see Aplt. App. 939-942, 983, 1057-59. In light of this dispute, for the purpose of deciding the legal questions posed on appeal we presume that misinstallation occurred. Plaintiffs maintain that the Pro-Torq system is unreasonably dangerous because it invites a particular type of misinstallation, namely, a failure to insert the keeper properly inside the groove, while believing it is inside the groove, due to its appearance. Aplt. Br. 21. MPP responds that, assuming it manufactured the subject product, the product was not unreasonably dangerous when sold, and thus not defective, because any potential danger to consumers arose not from the Pro-Torq design but from misinstallation that occurred after the production and sale of the product. MPP Br. 9.

Stemco purchased the Pro-Torq product line from MPP on November 19,

1996. Aplt. App. 100. Stemco agreed to pay a purchase price of $275,000 upon closing of the deal and agreed to make installment payments based on future sales up to a total purchase price of $675,000. Id. at 130-31. In the Asset Purchase Agreement, MPP agreed to "remain liable for and to discharge fully and timely, all debts, expenses, liabilities, obligations, contracts, commitments and claims of any nature whatsoever of or against Seller or any of its Affiliates . . . arising out of the ownership, operation or use of the Purchased Assets or the conduct of the Business prior to and on the date hereof." Id. at 133.

Section 5.2 of the Purchase Agreement continues,

From and after the date of this Agreement and the consummation of the transactions contemplated hereby, Stemco shall, upon the request of Seller, replace or repair any product generated by the Product Line which was sold by Seller prior to the date hereof and which Seller is obligated to replace or repair under the warranty to its customer. The cost of such replacement or repair, including all shipping, packaging and similar costs associated therewith, will be the obligation of the Seller, and Seller shall reimburse Stemco for any such costs within thirty (30) days of its receipt of any invoice in respect of such costs.

Id. at 136.

As part of the agreement to purchase the Pro-Torq line, MPP provided a list of known product failures that occurred during MPP's seven-year ownership period. This list of Pro-Torq Product Warranty Incidents was included as Exhibit 6.6 to the Asset Purchase Agreement. Id. at 1003-07, 1038, 1225. The district court concluded that fourteen of twenty-nine listed incidents involved improper installation, three of which were clearly unrelated to the defect alleged here. Id.

- 5 -

at 80-81.[1]

Stemco also entered into a five-year Supply Agreement with MPP, pursuant to which Stemco agreed to purchase its requirements for the PTN exclusively from MPP and MPP agreed to sell exclusively to Stemco. Id. at 419, 421-22. Stemco also agreed not to "initiate, directly or indirectly, the development of any technology designed to replace" the PTN prior to December 31, 2001. Id. at 423. MPP agreed to continue to package the nut in the same "bulk packaging as presently packaged." Id. at 425.

Todd L. Anderson, a Stemco executive, testified that, following the transaction, MPP continued to operate as a separate and independent company. Id. at 193. He also testified that at the time of acquisition Stemco did not assume any service contracts to repair or maintain the Pro-Torq line and that following the acquisition Stemco implemented new or different terms with distributors who continued to sell the line. Id.

Stemco implemented a number of design changes to the Pro-Torq product line, which included stamping the keepers with the phrase "This side facing out" and painting the keepers orange on one side. Id. at 107, 264. Beginning in 2001, Stemco also published a safety booklet titled "Total Quality Maintenance" that it distributed through its mailing distribution list, bill-to locations, distributors, a

---

[1] In our review of the Warranty Incidents we count sixteen cases that list improper installation or misinstallation as the problem or cause. Six of these expressly noted a keeper tab improperly engaged with the nut groove.

website, sales managers, and trade shows.  Id. at 110, 272-77, 691-726.  Stemco included information on the installation procedure for Pro-Torq in this booklet. Id. at 708-09.  It also recommended that consumers replace the keeper each time the Pro-Torq assembly was removed for maintenance.  Id. at 110.  Stemco asserts that this recommendation was "not based on the keeper deterioration from wear and tear, but based primarily on the possibility of mishandling and deformation." Id. at 333; see also id. at 273.

On December 10, 2008, the district court granted Stemco's motion for summary judgment with respect to Plaintiffs' claims of successor liability and failure to warn, concluding that Stemco was not liable as a successor to MPP and that Stemco did not have knowledge of a risk that required a warning.  On August 20, 2009, the court granted Defendants MPP and Timpte's motions for summary judgment with respect to Plaintiffs' claims of design defect, failure to warn, and negligence, on the grounds that Plaintiffs failed to provide sufficient evidence that the Pro-Torq product was defective (a) when sold by MPP and (b) when installed originally on the truck by Timpte.  On September 4, 2009, the court dismissed the remaining claims for the same reasons stated in the August 20 order.

On appeal, Plaintiffs argue that the district court erred (1) in dismissing their claims against MPP and Timpte on the basis that Utah law would not recognize a products liability claim for defective design based upon foreseeable

misinstallation of a product, (2) in dismissing their failure to warn claims against MPP and Timpte based upon an implication (rather than evidence) that a warning was given and an inadequate one at that, (3) in dismissing the post-sale failure to warn or successor liability claims against Stemco based upon the assumption that the device was installed properly and where factual questions exist regarding Stemco's relationship with MPP and its former customers.

Discussion

We review appeals from a district court's grant of summary judgment de novo; therefore we affirm if, viewing the facts in the light most favorable to the non-movant, there remains no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c)(2). In diversity cases, the substantive law of the forum state governs the underlying claims. Therefore, in examining the district court's grant of summary judgment, we apply Utah's substantive law of products liability. See Eck v. Marke, Davis & Co., 256 F.3d 1013, 1016 (10th Cir. 2001).

In resolving this case, we consider whether under Utah law (1) Stemco may be held liable as successor to MPP, (2) Stemco may be held liable based on Stemco's direct post-sale duty to warn, and (3) the foreseeable misinstallation of a product may render that product unreasonably dangerous.

A.      Stemco—Successor Liability.

Utah retains the traditional rule of successor nonliability. Under this rule, successor corporations are not liable for the defective products of their predecessors unless an acquisition includes an agreement to assume liabilities, constitutes a merger or consolidation, results in the continuation of the predecessor, or results from a fraudulent conveyance. Tabor v. Metal Ware Corp., 2007 UT 71, ¶ 7, 168 P.3d 814, 815 (quoting RESTATEMENT (THIRD) OF TORTS: PRODS. LIAB. § 12 (1998)). The Utah Supreme Court has declined to adopt the "product line" or "continuity of enterprise" exceptions recognized by some other states. Id. ¶ 11. The district court concluded that no reasonable juror could find Stemco was a continuation of MPP thereby bringing Stemco within one of the traditional exceptions. Aplt. App. 69. We agree.

Here, Stemco purchased MPP assets for cash. Id. at 130-31; see Decius v. Action Collection Serv., Inc., 105 P.3d 956, 959 (Utah Ct. App. 2004) ("The second exception, the 'de facto merger,' considers whether the business operations and management continued and requires that the buyer paid for the asset purchase with its own stock." (citation omitted)). MPP expressly agreed to retain any liabilities in connection with the purchased assets. Aplt. App. 133. MPP continued to operate as a separate entity. Id. at 193; see Decius, 105 P.3d at 959 ("[T]he [mere continuation] exception . . . is limited to situations where the selling and buying corporations are essentially the same entity (i.e., common directors, shareholders, etc.) operating under different names. In fact, the mere

continuation exception traditionally requires a continuation of ownership and control." (alterations in original) (citations omitted)). No allegations suggest that this asset purchase related to a fraudulent conveyance. Accordingly, we find the district court's conclusion correct and affirm summary judgment in favor of Stemco on this issue.

B.      Stemco—Successor Failure to Warn.

A corporation free from successor liability may nevertheless owe a duty to warn of dangers posed by its predecessor's products as a result of its ongoing relationship with the predecessor's customers. During the pendency of this action, Utah adopted section 13 of the Restatement (Third) of Torts: Products Liability, imposing "an independent post-sale duty on successor corporations to warn customers of defects in products manufactured and sold by the predecessor corporation." Tabor, 2007 UT 71, ¶ 12, 168 P.3d at 818.

Section 13 provides:

(a) A successor corporation or other business entity that acquires assets of a predecessor corporation or other business entity, whether or not liable under the rule stated in § 12, is subject to liability for harm to persons or property caused by the successor's failure to warn of a risk created by a product sold or distributed by the predecessor if:
      (1) the successor undertakes or agrees to provide services for maintenance or repair of the product[2] or enters into a similar

_____

[2]We will refer to this part of the disjunctive as the first prong of § 13(a)(1).

- 10 -

relationship with purchasers of the predecessor's products[3] giving rise to actual or potential economic advantage to the successor, and

(2) a reasonable person in the position of the successor would provide a warning.

(b) A reasonable person in the position of the successor would provide a warning if:

(1) the successor knows or reasonably should know that the product poses a substantial risk of harm to persons or property; and

(2) those to whom a warning might be provided can be identified and can reasonably be assumed to be unaware of the risk of harm; and

(3) a warning can be effectively communicated to and acted on by those to whom a warning might be provided; and

(4) the risk of harm is sufficiently great to justify the burden of providing a warning.

RESTATEMENT (THIRD) OF TORTS: PRODS. LIAB. § 13.

Applying section 13, the district court found no evidence that Stemco agreed to provide maintenance or repair services to MPP's customers and found limited support for the assertion that Stemco had entered into a "similar" relationship with MPP's customers. Aplt. App. 70. The court reasoned that the meaning of the word "similar" as used in the Restatement "is not immediately clear" but that "the commonly-accepted interpretation is that the word 'similar' refers back to the previous language which discusses provision of services by the successor for maintenance or repair." Id. at 70-71 (citing Travis v. Harris Corp.,

---

[3]We will refer to this part of the disjunctive as the second prong of § 13(a)(1).

565 F.2d 443, 449 (7th Cir. 1977); <u>Shane v. Hobam, Inc.</u>, 332 F. Supp. 526 (E.D. Pa. 1971); <u>Jacobs v. Lakewood Aircraft Serv., Inc.</u>, 512 F. Supp. 176 (E.D. Pa. 1981); <u>Pelc v. Bendix Machine Tool Corp.</u>, 314 N.W.2d 614 (Mich. App. Ct. 1981)).  The court concluded, "There is no evidence that Stemco provided any actual repair or maintenance services.  At most, Stemco possessed the capacity to replace parts previously sold by MPP and under warranty, but MPP retained the obligation to pay the cost of any such warranty services." <u>Id.</u> at 70.

However, the Asset Purchase Agreement between Stemco and MPP contained the following clause:

> [U]pon the request of [MPP], [Stemco shall] replace or repair any product generated by the [Pro-Torq line] which was sold by [MPP] prior to the date [of the purchase agreement] and which [MPP was] obligated to replace or repair under the warranty to its customer.

Aplt. App. at 136.  Thus, regardless of whether Stemco assumed or did not assume MPP maintenance and repair obligations, Stemco expressly agreed to provide services for maintenance or repair of the products.  Under the first prong of Section 13(a)(1), a plaintiff can establish a successor's duty to warn based on the fact that the successor agreed with the predecessor to provide services for maintenance or repair of the product, and Stemco did just that.  Therefore, it was not necessary, as the district court did, to determine whether Stemco entered into a "similar relationship" with purchasers of MPP's products.  It is immaterial under the language of the Restatement whether the customer or MPP could

- 12 -

request a repair. And, whether or not Stemco actually provided any repairs or maintenance services likewise does not change the fact that Stemco agreed to provide services for maintenance or repair of the Pro-Torq product. RESTATEMENT (THIRD) OF TORTS: PRODS. LIAB. § 13 (a)(1) (" . . . the successor undertakes or agrees to provide services for maintenance or repair of the product . . ." (emphasis added)).

Further, genuine material issues of fact remain regarding whether Stemco actually or potentially benefitted economically by its agreement. Under the Asset Purchase Agreement, Stemco received customer lists dating back one year prior to its acquisition of the Pro-Torq line. Aplt. App. 142. Stemco fulfilled purchase orders open at the time the agreement was made. Id. at 176. Stemco retained further contact with MPP customers by agreeing to make replacements and repairs as requested by MPP. See id. at 136. Such contact may have benefitted Stemco economically by providing Stemco with knowledge of and contact with customers in need of additional products, regardless of whether MPP or its former customers paid the costs of the services Stemco provided, and particularly in light of the role of regional service centers in the distribution of PTNs. See, e.g., Leannais v. Cincinnati, Inc., 565 F.2d 437, 442 (7th Cir. 1977) ("Maintaining service ties to Forte customers enables Cincinnati to influence future sales. Knowledge of when and where various customers may need additional machinery, and knowledge of the condition of equipment which may need replacement, are important sales

- 13 -

resources."); see Aplt. App. 835 (describing regional service centers as one of two main distribution centers for PTNs).

We therefore must proceed to consider whether a trier of fact could find that a reasonable person in Stemco's position would provide a warning. RESTATEMENT (THIRD) OF TORTS: PRODS. LIAB. § 13(a)(2). Under Utah law, a reasonable person would provide a warning if:

> (1) the successor knows or reasonably should know that the product poses a substantial risk of harm to persons or property; and
> (2) those to whom a warning might be provided can be identified and can reasonably be assumed to be unaware of the risk of harm; and
> (3) a warning can be effectively communicated to and acted on by those to whom a warning might be provided; and
> (4) the risk of harm is sufficiently great to justify the burden of providing a warning.

Tabor, 2007 UT 71, ¶ 12, 168 P.3d at 818 (quoting RESTATEMENT (THIRD) TORTS: PRODS. LIAB. § 13(b)).

The comment to section 13 directs us to section 10 for additional guidance in examining these sub-elements. See RESTATEMENT (THIRD) OF TORTS: PRODS. LIAB. § 13 cmt. c ("Whether a reasonable person in the successor's position would provide a warning is governed by the same requirements that determine whether a reasonable seller should provide a post-sale warning under § 10."). The language in § 13(b) is identical to that in § 10(b). The comment to section 10 advises further,

As with all rules that raise the question whether a duty exists, courts

must make the threshold decisions that, in particular cases, triers of fact could reasonably find that product sellers can practically and effectively discharge such an obligation and that the risks of harm are sufficiently great to justify what is typically a substantial post-sale undertaking. In deciding whether a claim based on breach of a post-sale duty to warn should reach the trier of fact, the court must determine whether the requirements in Subsection (b)(1) through (4) are supported by proof.

RESTATEMENT (THIRD) OF TORTS: PRODS. LIAB. § 10 cmt. a.

Evaluating the evidence in the light most favorable to the Herrods, we conclude that genuine issues of material fact exist concerning each of these four sub-elements. First, evidence exists suggesting that Stemco knew or reasonably should have known that the Pro-Torq product posed a substantial risk of harm to persons or property. MPP provided a list to Stemco of known product failures that occurred during MPP's seven-year ownership period. Aplt App. at 1003-07, 1038, 1225. The Warranty Incidents listed sixteen cases citing improper installation or misinstallation as the problem or cause. Six of these expressly noted a keeper tab improperly engaged with the nut groove. This list alone shows that Stemco reasonably should have known that the Pro-Torq product posed a substantial risk of harm to persons or property, but further documentation shows that a designated representative of the Pro-Torq product line was familiar with the installation problem in question. See MPP App. 22-23, at 14-19. In addition, Stemco's literature warns of the risk of wheel-offs that may occur by failure to ensure the keeper is properly seated into the groove during installation. Aplt.

- 15 -

App. 728.

Next, the Herrods have provided some evidence identifying those to whom a warning should have been provided and indicating that those people can reasonably be assumed to be unaware of the risk of harm. The Herrods argue that Stemco could have issued an industry-wide warning or at least a warning to mechanics that had the potential to work with the Pro-Torq product. This may or may not be sufficient to establish identification of those to whom a warning should have been given, but it does raise a material issue of fact for the purpose of this appeal from summary judgment. It also can be reasonably inferred that most mechanics in the industry were unaware of the risks associated with misinstallation of a single-nut system like the Pro-Torq product. The overall market share of the Pro-Torq product line was below 1%. Over 99% of semi-trucks in the trucking industry use a double-nut system to secure the wheel assembly instead of a single-nut system, such as the Pro-Torq product. See Aplt. App. at 834 ("[O]ne of the reasons for slower growth of sales for the PTNs is that not everyone in the heavy duty trucking industry feels comfortable with changing to a new product. The factories of OEMs may easily train their employees regarding the proper installation of the Pro-Torq Nuts but if the field service or dealers do not know how to re-install it, then it can cause problems."). Therefore, viewing these facts in the light most favorable to the Herrods, as we must here, a genuine issue of material fact exists concerning this sub-element.

Next, the Herrods have shown some evidence that a warning can be effectively communicated to and acted on by those to whom a warning might be provided. Stemco distributed the "Total Quality Maintenance" information through a mailing distribution list, bill-to locations, distributors, a website, sales managers, and trade shows. Aplt. App. 110, 272-77. Stemco had in its possession customer records dating back one year. As other companies have done in the past, Stemco could have issued a general warning to the trucking industry about the risk of misinstallation of the Pro-Torq keeper. See RESTATEMENT (THIRD) OF TORTS: PRODS. LIAB. § 10 cmt. g. ("When original customer sales records indicate which individuals are probably using and consuming the product in question, direct communication of a warning may be feasible. When direct communication is not feasible, it may be necessary to utilize the public media to disseminate information regarding risks of substantial harm."). For example, in 1993, a distributor of the Pro-Torq line discovered that the product was not compatible with a specific trailer. So it issued a news release to the fleet press warning of the risks associated with installing the Pro-Torq product on that type of trailer and urging the industry to discontinue use of the Pro-Torq product on those trailers. Based on that news release, the Department of Transportation's National Highway Traffic Safety Administration began conducting an investigation into this specific problem with the Pro-Torq product. See Aplt. App. at 1072-77. Further, several trucking magazines contacted one of the

distributors of the Pro-Torq product with inquiries about the news release, and trucking companies began taking action to alleviate the risk of using the product with those specific trailers. Similar to the above, an industry-wide news release could probably communicate the risks associated with misinstallations of the Pro-Torq keeper. Therefore we conclude a genuine issue of material fact exists concerning whether Stemco could have effectively disseminated warnings concerning its products.

Finally, the Herrods have shown that the risk of harm is sufficiently great to justify the burden of providing a warning. It seems difficult to dispute the high degree of danger associated with a 600-pound wheel assembly rolling or bouncing uncontrollably on a highway. And that risk would be sufficiently great to justify the burden of Stemco issuing a more specific warning.

In light of these remaining issues of material fact, a juror could find that Stemco's agreement to perform maintenance and repairs gave rise to potential or actual economic advantage and that a reasonable person in Stemco's situation would have warned of the risk associated with the Pro-Torq keeper prompting misinstallation. Therefore, we reverse summary judgment on the claim of Stemco's independent duty to warn.

C.     MPP and Timpte—Strict Liability:  Design Defect.

To establish a claim for a design defect in strict liability, Utah requires a sale of a product that creates an unreasonably dangerous situation for the user.

See Ernest W. Hahn, Inc. v. Armco Steel Co., 601 P.2d 152, 156, 158 (Utah 1979). Under Utah law, the Plaintiffs also must present evidence establishing that the product in question (1) was unreasonably dangerous, (2) due to a defect that was present at the time of sale, (3) that caused the injury. Utah Code Ann. § 78B-6-703; Burns v. Cannondale Bicycle Co., 876 P.2d 415, 418 (Utah Ct. App. 1994); see Brown v. Sears, Roebuck & Co., 328 F.3d 1274, 1278 (10th Cir. 2003) ("The [Utah] statute thus imposes a necessary condition for a cause of action. The statute does not state what is sufficient for a cause of action. Because Utah does not have another statute setting forth the elements of a products liability cause of action, the sufficient conditions for such a cause of action must come from the common law."). A product is considered defective if it is "unreasonably dangerous" at the time of sale by the manufacturer, § 78B-6-703(1), i.e., it "was dangerous to an extent beyond which would be contemplated by the ordinary and prudent buyer, consumer, or user of that product in that community considering the product's characteristics, propensities, risks, dangers, and uses together with any actual knowledge, training, or experience possessed by that particular buyer, user, or consumer, id. § 78B-6-702.

The district court concluded there was a dispute of fact over whether the nut and keeper were properly installed and, therefore, did not grant summary judgment with respect to this issue. Aplt. App. 82. Thus to dispose of the strict liability and negligence claims the district court considered only the question

whether the product was unreasonably dangerous, assuming an improper installation had occurred. Aplt. App. 83. The district court recognized that "[i]f Plaintiffs' legal argument is correct, the Court would likely need to deny summary judgment and allow the jury to determine foreseeability." Aplt. App. 84. Accordingly, in reviewing the court's grant of summary judgment we consider the issue of whether under Utah law a tendency toward misinstallation may render a product unreasonably dangerous. We conclude it may.

The district court relied on the proposition in Utah Local Government Trust v. Wheeler Machinery Co. that "the after-sale negligent installation of a nondefective product does not give rise to a product liability claim" to conclude that the Plaintiffs-Appellants had failed to allege an unreasonably dangerous product defect. Aplt. App. 84 (citing Wheeler Machinery Co., 2006 UT App. 513, ¶ 12, 154 P.3d at 179, rev'd on other grounds, 2008 UT 84, 199 P.3d 949). But Wheeler is inapposite because, there, the issue was whether an improper installation of nondefective component parts became integrated into the product itself for the purpose of product liability. Id. ¶¶ 11, 15. It was not alleged, as it is here, that the design of the component parts was the immediate foreseeable cause of the improper installation.

Misinstallation is relevant to determinations of defect, causation, and comparative fault. See RESTATEMENT (THIRD) OF TORTS: PRODS. LIAB. § 2 cmt. p ("[M]isuse, modification, and alteration are not discrete legal issues.

- 20 -

Rather, when relevant, they are aspects of the concepts of defect, causation, and plaintiff's fault."). By concluding that the alleged defect in this instance could not be traced to the design of the subject product, the district court erred by making a factual determination more appropriately submitted to a jury. E.g., Stewart v. Scott-Kitz Miller Co., 626 P.2d 329, 331 (Okl. App. 1981) ("What defendant is probably referencing to is the possible negligence of the maintenance people in placing the bolts in backwards. If perchance they were negligent, the injury might nonetheless be found to have resulted not from a misuse of the product, but from a foreseeably faulty repair ultimately traceable, causally, to a design defect."); id. ("The manufacturer could have forecast: (1) the necessity of later removal during routine maintenance of bolts critical to the proper and safe performance of the primary function of the subject equipment . . . and (2) the possibility of the bolts being replaced backwards . . . . It would have required very little effort or expense to design the bolts and their housings in a way that they could not be replaced backwards."); see Butterfield v. Okubo, 831 P.2d 97, 106 (Utah 1992) ("Proximate cause is a factual issue that generally cannot be resolved as a matter of law. Because proximate cause is an issue of fact, we refuse to take it from the jury if there is any evidence upon which a reasonable jury could infer causation." (citations omitted)).

Because of its legal conclusion, which in essence presumed a lack of defect to determine the product was not defective, the district court did not analyze the

determinative issues: whether the Plaintiff put forth sufficient evidence for a jury to conclude that the product was unreasonably dangerous, due to a defect that was present at the time of sale, that caused the injury; and whether there was a feasible alternative, safer design that was practicable under the circumstances.[4] See Allen v. Minnstar, Inc., 8 F.3d 1470, 1479 (10th Cir. 1993) (applying Utah law). Therefore, we reverse the district court's grant of summary judgment and remand for consideration of these issues.

D.     MPP—Strict Liability:  Failure to Warn.

To establish a claim in strict liability for a failure to warn, the Plaintiffs must rely on evidence tending to show that (1) MPP knew or should have known of the risk involved, (2) the risk was not disclosed or adequately disclosed rendering the product unreasonably dangerous, and (3) the failure to provide an adequate warning caused the injury. House v. Armour of Am., 929 P.2d 340, 343 (Utah 1996). The district court concluded that although MPP was aware of a risk, "MPP provided installation instructions with every product and provided a warning that bodily harm could result if the instructions were not followed."

---

[4]While the district court hinged summary judgment on the failure of the design defect theory, in a footnote the court also stated that it had previously rejected Plaintiffs' argument regarding the availability of a feasible alternative, safer design, citing the portion of its December 10, 2008, order that addressed Stemco's knowledge of the alleged risk. Aplt. App. n.16. Because it does not appear that the court actually considered MPP's argument regarding the availability of an alternative design, Aple. Br. 17, we instruct the court to consider this issue on remand.

Aplt. App. 88.  Moreover, the court concluded, the Plaintiffs failed to put forth

evidence of causation by failing "to identify a warning that would have prevented

the accident."  Id.

We find that material issues of fact exist precluding summary judgment.

MPP asserts that it provided installation instructions with every product.  MPP

Br. 5; see Aple App. 21 at 10-11; Aple App. 37 at 9.  Plaintiffs dispute this fact

and submit that a nonspecific warning of harm from failure to follow instructions

would not alert a user to the problem at hand.  Aplt. Br. 35; Aplt. Reply Br. 17.

In addition, MPP's instructions reflect revisions made over time, so it is unclear

from the record when MPP began to warn of the risk of wheel-offs.  One undated

MPP document provides five-step instructions for installation.  Aplt. App. 315.

The final step regards inspection of the keeper:

> 5. INSPECT THE INSTALLATION.  Make sure that the keeper tab
> and keeper arms are fully seated into the undercut groove.
> This procedure will consistently produce a bearing setting of .001 to
> .003 end play.

Id.  A second undated MPP document provides similar five-step instructions, with

a change to the fifth step:

> 5.  INSPECT THE INSTALLATION:  Failure to follow this
> instruction could cause the wheel to come off and cause bodily
> injury.  Make sure that the keeper tab and keeper arms are fully
> seated into the undercut groove.  Inspect keyway tang to insure it
> does not contact the bottom of the keyway.  If contact exists,
> immediately notify your Timken Company representative.

Id. at 317.  The latter instructions resemble closely those utilized by Stemco.  See

id. at 728. Finally, in reaching a conclusion with respect to causation based on the absence of a proffered alternative warning, see id. at 88; MPP Br. 25, the court failed to apply Utah's heeding presumption that a mechanic faced with an adequate warning would have followed that warning. See Aplt. App. 26. Under Utah law, "in cases in which it cannot be demonstrated what the plaintiff would have done had he or she been adequately warned, the plaintiff should be afforded a rebuttable presumption that he or she would have followed an adequate warning had one been provided." House, 929 P.2d at 347 (internal quotation marks and citation omitted).

In light of these considerations, we conclude that material issues of fact persist regarding whether MPP provided an adequate warning at the time it sold the subject parts, whether this rendered the system unreasonably dangerous, and whether the failure to provide an adequate warning caused the injury in this instance. Accordingly, we reverse the district court's grant of summary judgment with respect to MPP's alleged failure to warn.

E.      MPP and Timpte—Negligence.

The district court declined to consider whether material issues of fact remained concerning whether the product could have been made reasonably safe prior to use because it determined, as a matter of law, that "Plaintiffs have not shown that the Pro-Torq product was unreasonably dangerous." Aplt. App. 89. Therefore we also reverse and remand for the court to consider Plaintiffs'

negligence claim in light of our conclusions above.

AFFIRMED in part; REVERSED in part and REMANDED.

Entered for the Court
Per curiam