**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**November 29, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

LINSEY GROESBECK and
NICHOLAS GROESBECK,
individually and as next friends and
guardians of A.G., a minor,

Plaintiffs - Appellants,

v.

BUMBO INTERNATIONAL TRUST
f/k/a JONIBACH MANAGEMENT
TRUST, JONIBACH PTY, LTD. f/k/a
BUMBO PTY LTD., and WAL-MART-
STORES, INC.,

Defendants - Appellees.

No. 15-4150
(D.C. No. 1:13-CV-00090-DB)
(D. Utah)

---

**ORDER AND JUDGMENT**[*]

---

Before **KELLY** and **HOLMES**, Circuit Judges.[**]

---

[*]        This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel.  It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

[**]        The Honorable Neil Gorsuch heard oral argument in this appeal, but has since been confirmed as an Associate Justice of the United States Supreme Court; he did not participate in the consideration or preparation of this order and judgment.  The practice of this court permits the remaining two panel judges, if in agreement, to act as a quorum in resolving the appeal.  *See* 28 U.S.C. § 46(d); *see also United States v. Wiles*, 106 F.3d 1516, 1516 n.* (10th Cir. 1997) (noting this court allows remaining panel judges to act as a quorum to resolve an appeal); *Murray v. Nat'l Broad. Co., Inc.*, 35 F.3d 45, 47–48 (2d Cir. 1994) (remaining two judges of original three-judge panel may decide petition for rehearing without

In this products-liability action, Linsey Groesbeck and Nicholas Groesbeck (individually and as next friends and guardians of A.G., a minor) (collectively the "Groesbecks") allege that their child, A.G., suffered severe injuries when she fell from the "BUMBO BABY SITTER" seat ("Bumbo Seat"), which Mr. Groesbeck had placed on an elevated kitchen counter. As a result of those injuries, the Groesbecks brought strict-liability and negligence claims against the manufacturer of the Bumbo Seat, Bumbo International Trust f/k/a/ Jonibach Management Trust and Bumbo Pty. Ltd. (collectively "Bumbo"), and the retailer of their particular seat, Wal-Mart Stores, Inc. ("Wal-Mart"). Finding that the Groesbecks' claims failed as a matter of law, the district court entered summary judgment and a subsequent award of costs against them. The Groesbecks appeal.

Exercising jurisdiction under 28 U.S.C. § 1291, we **affirm** the district court's judgment.

**I**

In 1997, Johan Buitendach, a South African toolmaker, and his son, Johan Buitendag (collectively the "Buitendachs") designed, developed, and carved the Bumbo Seat—a Styrofoam seat that would allow caregivers to "feed, play, and interact" with infants in a "propped up" (but unharnessed) position. Aplts.' App.,

third judge), *cert. denied*, 513 U.S. 1082 (1995).

Vol. II, at 337 (Decl. of Johan Buitendag, dated Sept. 29, 2014). Following limited design adjustments (and other slight modifications), the Buitendachs began manufacturing and marketing the product under the umbrella of two family-run companies: Bumbo International Trust and Jonibach (Pty) Ltd. In the early years, the Buitendachs sold the Bumbo Seat only on a "very small scale" in South Africa, but by 2003, expanded their sales to "over 30 countries," including to the United States. *Id.*

As the scope of sales expanded, Bumbo submitted the product for consumer safety assessments by two independent agencies, Specialised Technology Resources (UK) Ltd. ("STR") and Bureau Veritas Consumer Products Services, Inc. ("BVCPS"). In these safety assessments, the Bumbo Seat received satisfactory ratings for its physical properties, material and construction qualities, and performance characteristics. Similarly, the Bumbo Seat received passing scores for the visibility, durability, and size of its warning markings, product specifications, and other safety information.

## A

In June 2004, Bumbo began to receive complaints of infants "fall[ing]" or "maneuver[ing]" out of the Bumbo Seat. Aplts.' App., Vol. III, at 521–22 (Bumbo's Log of Customer Complaints). Over the next three years, Bumbo documented over 200 similar complaints, with some reporting physical injuries. Despite these injuries, Bumbo made no immediate design modifications to the

3

Bumbo Seat, reasoning instead that at least some of the blame rested with "[p]arents" who failed to "read the [Bumbo Seat's safety] instructions." Aplts.' App., Vol. IV, at 791 (Dep. of Donald Pillai, dated Mar. 11, 2009).

Bumbo changed course, however, in October 2007, after receiving a letter from the U.S. Consumer Product Safety Commission ("CPSC"). In the letter, CPSC described its receipt of "more than 28 reports of young children falling out of . . . [Bumbo] seats that had been placed on elevated surfaces." *Id.* at 849 (Dep. of Antionette Wagenaar, dated Mar. 10, 2009). Following this communication, Bumbo voluntarily recalled (albeit at CPSC's insistence) the entire retail inventory of Bumbo Seats, in order to improve the safety information and instructions. As part of these efforts, Bumbo added warnings to the product packaging that instructed consumers to "[n]ever use [the Bumbo Seat] on any elevated surface," Aplts.' App., Vol. II, at 232, warned that "some babies will be able to move out of the Bumbo™," *id.* at 233, and advised parents to "never leave [their] child unattended," *id.* Similarly, Bumbo revised the instructional leaflet included within the product packaging to emphasize that the product was intended for use "on a safe, ground level surface," and to reiterate the following warning:

> **WARNING**
> **Prevent falls, never use on any elevated surface.**
> **Do not use:**
> •      **as a car or bath seat.**
> •      **in water.**
> •      **for prolonged periods.**
> **Use responsibly, some babies may get out of this seat.**

4

**Never leave your baby unattended.**

*Id.* at 235; *accord id.* at 318.  Finally, Bumbo placed these revised warnings on the Bumbo Seat itself:

**WARNING**

**NEVER USE ON A RAISED SURFACE
NEVER USE AS A CAR SEAT OR BATH SEAT
DESIGNED FOR FLOOR LEVEL USE ONLY
NEVER LEAVE YOUR BABY UNATTENDED
AS THE SEAT IS NOT DESIGNED TO BE
TOTALLY RESTRICTIVE AND MAY NOT
PREVENT RELEASE OF YOUR BABY IN THE
EVENT OF VIGOROUS MOVEMENT**

**\* \* \***

**WARNING - Prevent Falls:**
**Never use on any elevated surfaces**

*Id.* at 236–27; *accord* Aplts.' App., Vol. II, at 319.[1]

The CPSC then issued a press release advising consumers that if they placed the Bumbo Seat "on a table, countertop, chair, or other elevated surface, young children [could] arch their backs, flip out of the Bumbo Seat, and fall onto the floor, posing a risk of serious head injuries."  *Id.* Vol. IV, at 962 (Press Release, dated Oct. 25, 2007).  The CPSC consequently advised that "[c]onsumers should use the Bumbo seat at ground level, but should never leave a child

---

[1]     Visual depictions of these five warnings appear in Appendix A to this Order and Judgment, reproduced from the record in the order in which we have described them.

unattended." *Id.* In addition, the CPSC encouraged consumers to "contact Bumbo to obtain new warning label stickers and instructions, free of charge." *Id.* However, the CPSC did not require the installation of safety restraints, and Bumbo declined to make any design changes, opting instead to hire a public relations company to educate the public "on the purpose and safe use of the product." *Id.* Vol. III, at 558 (DPK's Public Relations Recommendation, dated Nov. 2007).

Despite the improved (post-recall) warnings and the public relations campaign, Bumbo continued to receive reports of injuries from the use of the Bumbo Seat at ground level and on elevated surfaces.

**B**

In the spring of 2010, the Groesbecks purchased their post-recall Bumbo Seat from a Wal-Mart in North Logan, Utah, and proceeded to use the product on elevated and ground surfaces over the next two years. Despite their lengthy period of using the seat, the Groesbecks claimed to be unaware of any safety hazards, and believed that the Bumbo Seat could function safely and effectively on elevated surfaces.

Things changed on June 24, 2012. Mr. Groesbeck was preparing breakfast for A.G. and her two-year-old brother. With A.G. seated in the Bumbo Seat on top of the kitchen island and A.G.'s brother positioned at the opposite end of the kitchen counter, Mr. Groesbeck attempted to feed each child. As he reached for

6

the dishwasher, however, he heard a sound and turned to find that A.G. had fallen, face down, on the tile floor. As a result of the fall, A.G. underwent emergency neurosurgery, and the Groesbecks contend that her injuries have caused permanent adverse effects.

## C

During the same general period, the CPSC reported additional "incidents and injuries involv[ing] both recalled Bumbo seats and Bumbo seats sold after the recall with the additional on-product warnings." Aplts.' App., Vol. III, at 554 (Press Release, dated Nov. 22, 2011). As a result, the CPSC urged parents to "use caution," and reiterated to consumers that infants could "fall or escape from the [Bumbo] seat by arching backward, leaning forward or sideways or rocking." *Id.* In direct communications with Bumbo, the CPSC then detailed its "preliminary determination that the Bumbo [S]eats . . . present a Substantial Product Hazard (SPH) . . . [and] a Substantial Risk of Injury (SRI) to children," because "the seat [failed to] safely contain infants." *Id.* Vol. IV, at 1014 (Email, dated Oct. 11, 2011). Given that assessment, the CPSC demanded that Bumbo prepare "a design modification to either address infant retention & tip over; and/or discourage ease of placing on high surfaces; and/or address area of impact (e.g. an attached play mat—discouraging convenience of counter placement, while also creating a soft surface should infant fall out while on floor)," and stated that "the warnings on the product and contained in the instructions must be substantially revised." *Id.*

7

Following these demands, Bumbo voluntarily recalled the Bumbo Seats sold throughout the United States. As part of the recall, Bumbo instructed consumers to stop using the Bumbo Seat until they ordered and installed the free repair kit: "a restraint belt with a warning label, installation instructions, safe use instructions and a new warning sticker." *Id.* Vol. V, at 1017. Bumbo also released "Voluntary Recall Safety Information," explaining that the safety restraint would "help prevent children from getting out of or falling from the seat," but nonetheless emphasizing that, "[e]ven with the belt, the seat should be used only as intended—on the floor with adult supervision." *Id.* at 1031.

**D**

Following the 2012 recall, the Groesbecks filed suit against Bumbo and Wal-Mart, asserting design-defect and failure-to-warn claims. The district court entered summary judgment on each of the Groesbecks' claims, and subsequently awarded Bumbo and Wal-Mart $31,684.32 in costs. The Groesbecks' timely appeal followed.

**II**

"We review a grant of summary judgment de novo, drawing all reasonable inferences and resolving all factual disputes in favor of the non-moving party."[2]

---

[2]    Because we review summary-judgment determinations de novo, "we need not separately address [the Groesbecks'] argument that the district court erred" by misapplying the summary-judgment standard and "by viewing evidence in the light most favorable to [Bumbo and Wal-Mart]." *Rivera v. City and Cty. of*

8

*Birch v. Polaris Indus., Inc.*, 812 F.3d 1238, 1251 (10th Cir. 2015) (quoting

*Yousuf v. Cohlmia*, 741 F.3d 31, 37 (10th Cir. 2014)).

"A court shall grant summary judgment if 'the movant shows that there is

no genuine dispute as to any material fact and the movant is entitled to judgment

as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)).  A dispute is genuine

when "the evidence is such that a reasonable jury could return a verdict for the

nonmoving party," and a fact is material when it "might affect the outcome of the

suit under the governing [substantive] law." *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 248 (1986).

### III

The Groesbecks bring claims under two distinct theories of liability: strict

liability and negligence.  We address each body of claims separately, and

ultimately conclude that the district court appropriately entered summary

judgment in favor of Bumbo and Wal-Mart on each of the Groesbecks' claims.

### A

We first address the Groesbecks' position that the district court erred in

granting summary judgment on their strict-liability claims against Wal-Mart and

Bumbo for design defect and failure to warn.  In entering summary judgment on

these claims, the district court found that Utah's passive-retailer doctrine shielded

*Denver*, 365 F.3d 912, 920 (10th Cir. 2004); *see also Park v. Gaitan*, 680 F. App'x 724, 730 n.4 (10th Cir. 2017) (unpublished).

9

Wal-Mart from strict liability, and that the Groesbecks failed to raise a triable issue on their claims against Bumbo. Challenging these conclusions on appeal, the Groesbecks argue that the district court misapplied Utah's passive-retailer doctrine, and ignored the genuine and material evidence they raised to support their strict-liability claims against Bumbo. We reject these arguments.

**1**

Turning to the Groesbecks' strict-liability claims against Wal-Mart, the district court found that Utah's passive-retailer doctrine shielded Wal-Mart from a strict-liability suit, because Wal-Mart "did not participate in the design, manufacture, engineering, testing, or assembly of the Bumbo Seat." Aplts.' App., Vol. IX, 2057–59 (Dist. Ct. Order, dated Sept. 9, 2015). The Groesbecks quarrel with this conclusion, arguing that "Wal-Mart's knowledge of the [alleged] defects in the Bumbo Seat preclude[] it from relying upon the passive[-]retailer doctrine." Aplts.' Opening Br. at 46–48; *accord* Aplts.' Reply Br. at 24–27. For the reasons that follow, we agree with the district court that Utah's passive-retailer doctrine shields Wal-Mart from strict liability, and conclude that Wal-Mart's knowledge (if any) of the alleged defect properly plays no part in that analysis.

Under Utah's Product Liability Act ("PLA"), Utah Code Ann. § 78B–6–701 to –707 (West 2008), a "manufacturer" or "initial seller" of an "unreasonably dangerous [product]" can be held liable for the entire amount of any resulting damages, *id.* § 78B–6–703(1); *see also Ernest W. Hahn, Inc. v. Armco Steel Co.*,

10

601 P.2d 152, 158 (Utah 1979), regardless of the degree of fault "attribut[ed] to that individual tortfeasor as opposed to another tortfeasor," *Sanns v. Butterfield Ford*, 94 P.3d 301, 305 (Utah Ct. App. 2004) (quoting *Nat'l Serv. Indus. v. B.W. Norton Mfg. Co.*, 937 P.2d 551, 554 (Utah Ct. App. 1997)). In 1986, however, the Utah Liability Reform Act ("ULRA"), Utah Code Ann. § 78B–5–820(1) (West 2008), "replaced the rule of joint-and-several tort liability with a rule of comparative fault." *McQuivey v. Fulmer Helmets, Inc.*, 335 P.3d 361, 363 (Utah Ct. App. 2014). The ULRA's comparative-fault regime limited the "maximum amount" of a defendant's liability to the "percentage or proportion of fault attribut[able] to that defendant." Utah Code Ann. § 78B–5–820(1). Consequently, under the ULRA, "a plaintiff in a products-liability case may recover from each defendant only in proportion to that defendant's fault (including strict liability)." *McQuivey*, 335 P.3d at 363.

The ULRA therefore created inherent "[t]ension" with the PLA, in that "together they require a finder of fact to apportion relative fault to a codefendant whose liability does not depend on fault as commonly understood in tort law." *Id.* at 364. In response to this tension, Utah state courts "devised the passive-retailer doctrine"—"an exception to strict liability" under the PLA for sellers "who do not 'participate in the design, manufacture, engineering, testing, or assembly' of a product." *Id.* (quoting *Sanns*, 94 P.3d at 307).

"Under this doctrine, 'a passive retailer is not subject to a strict liability

11

claim . . . where the manufacturer is a named party to the action.'" *Id.* (omission in original) (quoting *Yirak v. Dan's Super Mkts. Inc.*, 188 P.3d 487, 489 (Utah Ct. App. 2008)). In that scenario, Utah courts reason, "there remains no [justification] to require [a passive retailer] to incur the time and expense of defending" the action, *Sanns*, 94 P.3d at 307, because strict liability fault "lies with the manufacturer, not with . . . the passive retailer," *Yirak*, 188 P.3d at 489 (Utah Ct. App. 2008) (quoting *Sanns*, 94 P.3d at 307).

Utah courts have discussed and applied the passive-retailer doctrine on a few occasions. In each decision, the Utah courts have stressed the doctrine's sweeping breadth and straightforward application. In *Sanns*, for example, a commercial van unexpectedly "rolled several times, seriously injuring [the plaintiff] and other passengers." 94 P.3d at 303. As a result, the plaintiff brought suit "to hold both [the retailer] and [the manufacturer] strictly liable for manufacturing and design defects in the van." *Id.* at 307. Nevertheless, because the retailer had no part "in the design, manufacture, engineering, testing, or assembly of the van," the Utah Court of Appeals determined that the passive-retailer doctrine shielded the retailer from strict liability. *Id.* at 307.

Similarly, in *Yirak*, the plaintiff discovered a piece of glass in her prepackaged salad, and proceeded to bring strict-liability claims against the seller and the manufacturer. *See* 188 P.3d at 488, 489 n.3. As in *Sanns*, however, the undisputed evidence demonstrated that the retailer played no role in the

12

"manufacture [], design [], repackag[ing], label[ing], or inspect[ion] [of] the prepackaged salads supplied by [the manufacturer]," *id.* at 489 (first and second alterations in original) (quoting the record), and the Utah Court of Appeals concluded that the passive-retailer doctrine shielded the retailer from strict liability, *id.* at 490.

Finally, in *McQuivey*, after a protective helmet collapsed during an all-terrain vehicle crash, the plaintiff brought suit against the foreign manufacturer and the domestic distributor. *See* 335 P.3d at 362. The domestic distributor argued for application of the passive-retailer doctrine, but the record evidence reflected that the distributor exercised some involvement in the helmet design (by receiving samples), participated in the manufacture and testing (by conducting on-site visits of the assembly line and reviewing quality-control procedures), and held "itself out to the public as the manufacturer." *Id.* at 365. Accordingly, the Utah Court of Appeals found the passive-retailer doctrine inapplicable. *Id.* at 366.

*Sanns*, *Yirak*, and *McQuivey*, individually and collectively, speak to one clear premise: a passive retailer cannot be held strictly liable for a product defect *unless* the record evidence discloses some basis to conclude that the retailer participated in the design, manufacture, engineering, testing, or assembly of the challenged product. Viewed through this lens, the passive-retailer doctrine squarely defeats the Groesbecks' strict-liability claim against Wal-Mart, because

13

the Groesbecks concede that Wal-Mart performed none of these functions.  The

Groesbecks acknowledge instead Bumbo's exclusive role in the design,

manufacture, engineering, testing, and assembly of the Bumbo Seat.

Nonetheless, the Groesbecks "quote" *Sanns* and *Yirak* for the proposition

that "knowledge of any design or manufacturing defect" defeats passive-retailer

protection, Aplts.' Opening Br. at 46 (purporting to quote *Sanns*, 94 P.3d at

305–06), and then proceed to recount the evidence that reveals, in their view,

Wal-Mart's "knowledge of the Bumbo Seat's defects," *id.* at 46.  The passive-

retailer doctrine, however, includes no knowledge component, and the

Groesbecks' *Sanns*-centric argument relies on a summary of the Utah trial court's

decision, not the *Sanns* holding.  *Compare id.* ("Under Utah law, a passive retailer

is a seller who 'did not participate in the design, manufacture, engineering, testing

or assembly' of the product and who had "no knowledge of any design or

manufacturing defect." (purporting to quote *Sanns*, 94 P.3d at 305–06)), *with*

*Sanns*, 94 P.3d at 307 (reciting the trial court's finding that the retailer "was

merely a passive retailer with *no knowledge of any design or manufacturing*

*defects*," but concluding on appeal that the retailer qualified as a passive retailer

*because* it "did not participate in the design, manufacture, engineering, testing, or

assembly" of the challenged product (emphasis added)).  Similarly, the *Yirak*

court mentioned knowledge in a parenthetical summary of Delaware's statutory

approach to the passive-retailer doctrine, *see* 188 P.3d at 489 n.4 (quoting Del.

14

Cod. Ann. tit. 18, § 7001 (West 1999)), and then in summarizing the plaintiff's wide-ranging evidentiary deficiencies on summary judgment, *see id.* at 489, but *not* in defining the contours of Utah's passive-retailer exception.

Thus, the Groesbecks' position that knowledge constitutes a required element of the passive-retailer doctrine finds no convincing source in Utah law, and "it is not our place to expand Utah state law beyond the bounds set by the Utah [state courts]." *Belnap v. Iasis Healthcare*, 844 F.3d 1272, 1295 (10th Cir. 2017) (quoting *Proctor & Gamble Co. v. Haugen*, 222 F.3d 1262, 1280 (10th Cir. 2000)). For all of these reasons, we conclude that the entry of summary judgment was appropriate on the Groesbecks' strict-liability claim against Wal-Mart.

## 2

We next address the Groesbecks' argument that the district court erred in granting summary judgment on their strict-liability claims against Bumbo for design defect and failure to warn. Addressing each aspect of these claims, we agree with the district court's summary-judgment decision.

### a

Under Utah law, "[p]roducts liability [claims] always require[] proof of a defective product, which can include 'manufacturing flaws, design defects, and inadequate warnings regarding use.'" *Gudmundson v. Del Ozone*, 232 P.3d 1059, 1070 (Utah 2010) (quoting *Bishop v. GenTec Inc.*, 48 P.3d 218, 225 (Utah 2002)). In order to recover for a design defect under a strict-liability theory, the

15

Groesbecks must prove: "(1) that a defect or defective condition of the product made it *unreasonably dangerous*, (2) that the defect was present at the time of the product's sale, and (3) that the defective condition [caused] the plaintiff's injuries." *Id.* at 1072 (emphasis added) (quoting *Schaerrer*, 79 P.3d at 928); *see also* Utah Code Ann. § 78B–6–703(1) (describing the same standard).

The PLA then defines the critical term "unreasonably dangerous" to mean:

> that the product was dangerous to an extent beyond which would be contemplated by the ordinary and prudent buyer, consumer, or user of that product in that community considering the product's characteristics, propensities, risks, dangers, and uses together with any actual knowledge, training, or experience possessed by that particular buyer, user, or consumer.

Utah Code Ann. § 78B–6–702. Simply stated, the statutory definition "imposes 'an objective consumer expectations test' supplemented by a 'subjective test based on the individual knowledge, training, and experience of the particular buyer, user, consumer, or, possibly, victim.'" *Henrie v. Northrop Grumman Corp.*, 502 F.3d 1228, 1232 (10th Cir. 2007) (interpreting and applying Utah law) (quoting *Brown v. Sears, Roebuck & Co.*, 328 F.3d 1274, 1282 (10th Cir. 2003)).[3]

Under the objective test, "[t]he issue, roughly speaking, [concerns] whether an ordinary person would think the product is less dangerous than it is." *Brown*, 328 F.3d at 1280. The subjective component, by contrast, considers "the

---

[3] *Henrie* and *Brown* discuss Utah Stat. Ann. § 78–15–6, a statute that has since been renumbered as Utah Code Ann. § 78B–6–703 (the version of the PLA we discuss and apply here).

16

particular person's appreciation of the product's danger," *id.* at 1282, as evident from the "actual knowledge, training, or experience possessed by that particular buyer, user or consumer," Utah Code Ann. § 78B–6–702; *see also Brown*, 328 F.3d at 1281–82. Importantly, subjective "information can only work against a plaintiff's claim that a product is unreasonably dangerous because it increases the extent of the perceived danger beyond that contemplated by the ordinary and prudent person." *Brown*, 328 F.3d at 1282; *see also Henrie*, 502 F.3d at 1232. Consequently, if a product does not meet the objective meaning of "unreasonably dangerous," courts need not reach "the subjective information of the 'particular' person." *Niemela v. Imperial Mfg., Inc.*, 263 P.3d 1191, 1196 (Utah Ct. App. 2011) (quoting *Brown*, 328 F.3d at 1282).

Considering these matters, the district court reasoned that the Bumbo Seat failed to qualify as "unreasonably dangerous" because the combination of "[c]ommon sense" and the numerous product warnings readily disclosed the risk of children falling from the seat. Aplts.' App., Vol. IX, at 2061–62. To bolster this conclusion, the district court pointed to the "remarkably" low number of falls (ninety-one out of 3.85 million Bumbo Seats sold), and concluded that "the ordinary and prudent consumer understood the danger a Bumbo Seat pose[d] and [did] not risk leaving a child unattended on an elevated surface." *Id.*

In ascribing error to this disposition, the Groesbecks draw our attention to

three pieces of "material" evidence:[4] *first*, the conclusion of their liability expert,

Dr. John E. Meyer, on the "unreasonably dangerous and defective[] design[]," given the product's "clear propensity to cause serious injuries to children—even while being used on the floor"; *second*, to the ongoing, post-recall injuries and the related reports on the beneficial impact of a safety restraint system; and *third*, to the fact that other district courts have denied summary judgment on design-defect claims raising the "precise question" at issue here.[5] Aplts.' Opening Br. at 20–23. None of this evidence raises a genuine dispute regarding the Groesbecks' design-defect claim.

---

[4] In addition, the Groesbecks refer us, without discussion, to "other evidence" contained within widely scattered portions of the appellate record. Aplts.' Opening Br. at 22 (citing Aplts.' App., Vol. III, at 438–43, 453–58, 715–17; *id.* Vol. IV, at 742–43, 834–35, 854–55, 860–61, 865, 939–41; *id.* Vol. V, at 1091)). The "other evidence" includes (1) pieces of the Groesbecks' summary judgment submissions to the district court, *see* Aplts.' App., Vol. III, at 438–43, 453–58; (2) largely obscured Bumbo marketing materials, *see id.* at 715–17; (3) pages of deposition testimony, *see id.* Vol. IV, at 742–43, 834–35, 854–55, 860–61, 865, 939–41; and (4) a document entitled "Standard Consumer Safety Specification for Children's Chairs and Stools." Aside from identifying this "evidence," the Groesbecks provide no substantive discussion of these materials; yet, "bald assertions in briefs," as here, do not provide a sufficient basis to invoke appellate review, much less to demonstrate genuine disputes of material fact sufficient "to merit reversal of summary judgment." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 679 (10th Cir. 1998).

[5] The Groesbecks complain that the district court erred by considering the affirmative defense of product misuse in the context of summary judgment. However, neither Bumbo nor Wal-Mart appeared to move for summary judgment on a defense of misuse. And, more to the point, the district court's decision does not reference or dispose of any such defense. As a result, we need not address this matter further.

18

Under the objective inquiry applicable here, we consider whether the Bumbo Seat posed a greater risk of falling (whether from an elevated surface or not) than "would be contemplated by the ordinary consumer . . . with the ordinary knowledge common to the community as to [the Bumbo Seat's] characteristics." *Brown*, 328 F.3d at 1280–81 (quoting RESTATEMENT (SECOND) OF TORTS § 402A, cmt. i (Am. Law. Inst. 1965)).  In other words, Utah law considers a product objectively defective "only where the product is, at the time it leaves the seller's hands, in a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him."  *Henrie*, 502 F.3d at 1233 (quoting RESTATEMENT (SECOND) OF TORTS § 402A, cmt. g).

Utah's consumer-expectations test therefore differs markedly from the risk-utility analysis that some jurisdictions employ, where the inquiry focuses on "the *actual* risks and benefits of the design" and relies upon expert evidence regarding product safety and feasible, alternative designs.  *Brown*, 328 F.3d at 1281.  This critical legal distinction proves dispositive here.  A straightforward (untrained) inspection of the Bumbo Seat (at the relevant time of sale) reveals the following: (1) the product consists of a single piece of molded foam with leg holes and without any semblance of a restraint system; (2) the product bears numerous warnings advising consumers never to use the product on elevated surfaces; and (3) the warnings on the product and packaging specifically disclose (in numerous locations) the risk of a fall or "release . . . in the event of vigorous movement."

19

Aplts.' App., Vol. II, at 236–37 (depicting images of the Bumbo Seat); *see also*

*id.* Vol. III, at 582 (explaining, based on a visual inspection and certain

specification documents, that the Bumbo Seat "possesses no restraints, but rather

depends on the geometric design of the device to restrain the occupant"); *id.* Vol.

IV, at 962 (describing the Bumbo Seat as a piece of molded foam with leg holes,

with warnings advising that "the seat is not designed to be totally restrictive and

may not prevent release . . . in the event of vigorous movement'"). Viewed in this

light, the Bumbo Seat's physical appearance and its warnings should have

suggested a risk of falling to the ordinary and prudent consumer, especially when

the seat is used on raised surfaces.[6]

---

[6] Relying on similar observations, the district court reasoned that "[c]ommon sense" would have warned "the ordinary and prudent consumer" of the risk of release "without a restraint." Aplts.' App., Vol. IX, at 2061. The Groesbecks challenge this assertion by arguing that the district court improperly "hazard[ed] a guess at what 'common sense' may tell 'the ordinary and prudent consumer,'" all while ignoring any common sense inference in their favor. Aplts.' Opening Br. at 24–25. Relying on their expert and Bumbo's marketing materials, the Groesbecks then suggest that "the Bumbo Seat's allegedly 'revolutionary' design—and Bumbo's marketing campaign—caused parents to either underestimate the dangers posed by the Bumbo Seat, or to fail to comprehend any danger at all." *Id.* at 25 (quoting Aplts.' App., Vol. V, at 505–06).

We find no fault in the district court's analysis, however. Though they do not use the term "common sense" (or a derivative thereof), the court's approach is consistent with the analysis evident in *Brown*, *Henrie*, and *Niemela*. In *Brown*, the plaintiff's two-year-old son suffered injuries after a lawnmower backed over him, and the plaintiff brought suit on the theory that the lawnmower could have been equipped with a safety feature that prevented it from traveling in reverse with the mower blades engaged. *See* 328 F.3d at 1276–77. Based on our

(continued...)

20

With those observations in mind, the question becomes whether the

Groesbecks' recounted evidence on appeal raises a triable issue on whether the

ordinary consumer would have expected that an unrestrained infant might fall

from the Bumbo Seat if it was left on an elevated surface. Addressing each piece

of evidence, we conclude that their evidence falls short.

The Groesbecks' expert, Dr. Meyer, defined the Bumbo Seat as an

"unreasonably dangerous" product.[7] *Id.* Vol. III, 494 (Decl. of Dr. John E. Meyer,

dated June 23, 2014). Dr. Meyer's conclusion, however, hinged on his view of

the beneficial impact of an *alternative* safety system, *not* on his opinion of the

---

[6](...continued)
perspective of the product (and the lack of any sufficiently compelling counter-arguments or evidence), however, we determined that "[a]n ordinary and prudent user of the mower would have appreciated the danger arising from the operation of the mower blades while the tractor was moving in reverse." *Id.* at 1283. Similarly, in *Henrie*, the plaintiff injured his arm and shoulder while using a "glass fixture" to paint military airplane parts. 502 F.3d at 1229. Based on our review of the evidence, however, we concluded that the glass fixture did not meet Utah's standard for "unreasonably dangerous," because the "community of users . . . contemplated" the relevant hazard. *Id.* at 1238. Finally, in *Niemela*, the plaintiff alleged that a mailbox's design defect caused her serious and permanent hand injuries. *See* 263 P.3d at 1194. In considering the objective inquiry, however, the Utah Court of Appeals concluded, "[i]n [*its*] judgment," that the mailbox flaws provided insufficient evidence to meet the consumer-expectations test. *Id.* at 1197 (emphasis added). These decisions endorse a common-sense approach, and we follow them here.

[7] In addition, Dr. Meyer opined that Bumbo's design violated industry standards. Dr. Meyer, however, offers his industry-standards opinion only as added support for his position on a safer *alternative* design; consequently, this aspect of his opinion likewise fails to address the objective expectations of the ordinary consumer regarding the product as actually marketed and purchased here.

21

ordinary consumer's expectations of the product as marketed and purchased here. Indeed, in his nineteen-page report, Dr. Meyer details, at great length, a safer and economical alternative design, but makes no reference to the consumer-expectations analysis. Nor does he offer an opinion on the central question here: whether the Bumbo Seat posed a danger beyond what "would be contemplated by the ordinary and prudent buyer, consumer or user of [the Bumbo Seat] in th[e] community." *Henrie*, 502 F.3d at 1233 (quoting Utah Code Ann. § 78–15–16(2) (the PLA prior to renumbering)). Dr. Meyer's opinion therefore creates no genuine dispute of material fact on the Groesbecks' design-defect claim. *See Henrie*, 502 F.3d at 1230, 1233 (finding expert evidence of a safer alternative design insufficient to satisfy the consumer-expectations test under Utah law); *Brown*, 328 F.3d at 1279, 1282–83 (finding that an expert report on a safer alternative design failed to satisfy the objective test under Utah law).

The Groesbecks fare no better with their evidence of ongoing injuries and reports on the benefit of a safety restraint. Specifically, the Groesbecks draw our attention, in particular, to the following: (1) a November 19, 2001 safety assessment by TŪV Product Service ("TŪV"); (2) the continual injuries post-2007 recall (and warnings revisions); and (3) various correspondence and reports relative to the 2012 product recall. However, at bottom, this evidence lends them no succor.

In the safety assessment, TŪV concluded that the Bumbo Seat showed

22

"[c]ritical anomal[ies] for . . . safety," Aplts.' App., Vol. III, at 510 (Technical Report No. 70021218, dated Nov. 19, 2001), because the product rested at a low angle and lacked a safety restraint system, among other issues immaterial to this appeal, *see id.* at 511–12. Although dressed in different terms, the TŪV assessment ultimately offers nothing more than Dr. Meyer's. TŪV simply identifies a safer alternative design, but provides no information from which one might divine the *objective* expectations of the *ordinary* (non-expert) consumer. *See Niemela*, 263 P.3d at 1197 (rejecting the notion that the existence of an "easier to use" or "safer" alternative addresses whether the product was unreasonably dangerous).

Similarly, the Groesbecks point to the ongoing incidents after the 2007 recall. But they offer no connection between the mere occurrence of additional injuries and the objective expectations of the ordinary consumer. Beyond that, we agree with the district court that the number of incidents concerning the Bumbo Seat, .0049%,[8] does not militate in favor of finding a genuine dispute of

_____

[8] The Groesbecks urge us to credit the "higher number" of incidents known to Bumbo (318), rather than the CPSC's reported figure (ninety-one). The "higher number," however, captures a wide swath of issues, and not just the circumstance that forms the foundation for the Groesbecks' claim—i.e., falls from elevated surfaces. *See* Aplts.' App., Vol. III, at 554 (identifying forty-five falls from elevated surfaces that occurred after the October 25, 2007 recall); *id.* Vol. IV, at 962 (identifying twenty-eight reports of falls from elevated surfaces prior to the October 25, 2007 recall); *id.* at 971–1011 (listing all known incidents relative to the Bumbo Seat). Consequently, we see no reason to adopt the higher figure,

(continued...)

23

material fact on the expectations of the *ordinary* consumer. *See id.* at 1197

(finding the mere occurrence of injuries insufficient, without more, "to establish

that a product is unreasonably dangerous").

Finally, we reject the Groesbecks' effort to create a genuine dispute of

material fact through reliance on correspondence and reports relative to the 2012

product recall. The consumer-expectations test at issue here "considers a

defective condition to be present 'only where the product is, *at the time it leaves*

*the seller's hands*, in a condition not contemplated by the ultimate consumer,

which will be unreasonably dangerous to him.'" *Henrie*, 502 F.3d at 1233

(emphasis added) (quoting RESTATEMENT (SECOND) TORTS § 402A, cmt. g). The

circumstances surrounding a recall that occurred over two years later hardly

serves to significantly inform this at-the-time-of-sale inquiry, and the Groesbecks

have provided no authority to support their reliance on such temporally distant

information.[9]

For all of these reasons, we conclude that the district court's entry of

---

[8](...continued)
and even if we did, our conclusion would remain the same.

[9]        Nor are we persuaded by the fact that "four [district] courts" from
outside this circuit denied summary judgment with respect to purportedly
analogous circumstances; those decisions applied different state laws to distinct
factual records. Aplts.' Opening Br. at 22 (referring to district court decisions
from the Southern District of Texas, the Western District of Missouri, the Southern
District of Florida, and the District of Arizona). Setting aside this critical
distinction, federal district court decisions—whether within or without our
circuit—are not binding on us.

summary judgment on the Groesbecks' strict-liability claim against Bumbo for design defect was appropriate, and turn to the Groesbecks' claim against Bumbo for failure to warn.

**b**

Under Utah law, "a manufacturer may be held strictly liable for any physical harm caused by its failure to provide adequate warnings regarding the use of its product." *House v. Armour of Am., Inc.*, 929 P.2d 340, 343 (Utah 1996). As with a claim for design defect, in order to recover on an inadequate-warnings claim under a strict-liability theory, the Groesbecks must prove: (1) that a defect or defective condition of the product made it unreasonably dangerous, (2) that the defect presented itself at the time of the product's sale, and (3) that the defective condition caused the plaintiff's injuries. *See Gudmundson*, 232 P.3d at 1072; *see also Schaerrer v. Stewart's Plaza Pharmacy, Inc.*, 79 P.3d 922, 928 (Utah 2003) (same).

Under this standard, an adequate warning "must completely disclose all [of] the risks involved, as well as the extent of those risks." *House v. Armour of Am., Inc.*, 886 P.2d 542, 551 (Utah Ct. App. 1994), *aff'd*, *House*, 929 P.2d 340. The "warning must (1) be designed so it can reasonably be expected to catch the attention of the consumer; (2) be comprehensible and give a fair indication of the specific risks involved with the product; and (3) be of an intensity justified by the magnitude of the risk." *Id.* (quoting *Pavlides v. Galveston Yacht Basin, Inc.*, 727

25

F.2d 330, 338 (5th Cir. 1984)). As in the design-defect context, a warning's overall adequacy "must be judged in light of the ordinary knowledge common to members of the [relevant] community" at the time of sale. *Id.*; *see also* Utah Code Ann. § 78B–6–703(1) (explaining that the claimed defect—inadequate warnings—must exist at the time of sale); *Dimick v. OHC Liquidation Trust*, 157 P.3d 347, 350 (Utah Ct. App. 2007) (same).

Applying these principles, the district court found Bumbo's warnings adequate as a matter of law, given the "intuitively clear" risk of using the product on a raised surface. Aplts.' App., Vol. IX, at 2064–65. In doing so, the district court noted the "two warnings on the box; one on the leaflet; and two on the product itself," and stressed that "the warning on the front of the Bumbo Seat unambiguously state[d] 'Prevent Falls: Never use on any elevated surface.'" *Id.* at 2064.

Challenging this decision on appeal, the Groesbecks focus their attention on the evidence that: (1) consumers often disposed of the Bumbo box *after* the time of sale, and that the box's "overabundance of information" may have, in any event, diminished the ostensible importance of the product warning; (2) typographical issues often obscured the on-product warnings *after* the time of sale; (3) the on-product warnings failed to adequately convey the ease with which a child could maneuver out of the seat, and the propensity of such maneuvering to cause severe injury; and (4) the warnings should have been, in the opinion of the

26

Groesbecks' expert, more conspicuous given the product's seemingly benign and innocuous appearance. Aplts.' Opening Br. at 36–42. Despite their insistence to the contrary, none of this evidence raises a genuine dispute of material fact on the Groesbecks' warnings-based claim.

The Bumbo Seat *at the time of sale* advised consumers in five separate locations (and in emphasized print distinct from the surrounding material) against engaging in the *precise* conduct that engendered A.G.'s injuries—that is, using the Bumbo Seat on an elevated surface. The two warnings on the box stressed that the Bumbo Seat should never be used on elevated surfaces, and explained that "some babies will be able to move out of the Bumbo," Aplts.' App., Vol. II, at 232–34; the instructional leaflet reiterated this instruction and added that consumers should "[u]se [the product] responsibly, [because] some babies may get out of this seat," *id.* at 235; and the on-product warnings reinforced these directions by stating that the Bumbo Seat "MAY NOT PREVENT RELEASE OF YOUR BABY IN THE EVENT OF VIGOROUS MOVEMENT" and that, to avoid falls, consumers should "[n]ever use on any elevated surfaces," *id.* at 236–37.

To the ordinary consumer, the numerosity, clarity, and prominence of these warning would easily have communicated the dangers of placing the Bumbo Seat on an elevated surface. Indeed, Bumbo used typographical features (size, color, and capitalization) to underscore the importance of the warnings and to squarely address the relevant risk of falls—among other means, warning of the hazard in

27

capitalized, bolded, and red-print font on the product itself. *See infra* App. A. Furthermore, it positioned the numerous warnings in a manner justified by the magnitude of the risk. Although the Groesbecks would undoubtedly quarrel with these conclusions, their unsubstantiated challenges to the adequacy of the warnings fail to raise a genuine dispute of material fact.

We also are not persuaded by the Groesbecks' contentions regarding disposal of warnings and alleged typographical deficiencies. *See* Aplts.' App., Vol. III, 632 (Decl. of Michael Wogalter, Ph.D., dated Dec. 3, 2014) (explaining the "well known [concept] that people commonly discard packaging after removal of the product – as Mrs. Groesbecks did here"), *id.* Vol. IV, 787 (deposition testimony of Bumbo's marketing executive, Mr. Pillai, in which he acknowledges that consumers discard the Bumbo box and leaflet, leaving only the product itself). In this regard, we underscore that the adequacy inquiry focuses on the nature of the warnings *at the time of sale*. Specifically, Utah law requires that the defect be present at the time of sale, *see* Utah Stat. Ann. § 78B–6–703(1) ("[A] product may not be considered to have a defect or to be in a defective condition, *unless at the time the product was sold by the manufacturer or other initial seller*, there was a defect or defective condition in the product which made the product unreasonably dangerous to the user or consumer." (emphasis added)). By contrast, without reference to controlling or persuasive authority, the Groesbecks would have us assess adequacy through the prism of after-sale consumer conduct

28

(the immediate disposal of the packaging materials, etc.) *and* typographical issues that emerge after sale (fading ink and the like). This we cannot do.

More specifically, we cannot discern a sound legal basis for discounting the significance of written warnings simply because consumers *ultimately* ignore them. Similarly, we cannot conclude that typographical issues (most of which arose *after* the time of sale) create a genuine dispute of material fact regarding the adequacy of the Bumbo's *overall* warnings.

Considering the warnings in the form provided at the time of sale, we conclude that the district court's entry of summary judgment was appropriate on the Groesbecks' strict-liability claim against Bumbo for failure to warn.

**B**

We next address the Groesbecks' position that the district court erred in granting summary judgment on their negligence claims against Bumbo (premised on the same theories underpinning their strict-liability claims) and against Wal-Mart (for breach of the alleged post-sale duty to warn).[10] In entering summary judgment in Wal-Mart's favor, the district court applied a purported post-sale duty to warn under Utah law, but found no violation of that duty as a matter of

---

[10] The Groesbecks' briefing leaves some ambiguity on the precise contours of their negligence claims against Wal-Mart. Nevertheless, their claim for breach of the continuing duty to warn appears to present their only potentially viable negligence claim, and the only theory they substantively and specifically press on appeal.

29

law. Turning to the Groesbecks' negligence claim against Bumbo, the district court reasoned that their general negligence claim failed for the same reasons as their substantively identical strict-liability claim. Challenging these conclusions, the Groesbecks argue that the district court misapplied Wal-Mart's post-sale duty to warn, and disregarded the material evidence that supported their negligence claims against Bumbo. We reject these arguments.

## 1

Turning first to Wal-Mart's alleged post-sale duty to warn, the district court concluded that the Groesbecks failed to raise a genuine factual dispute on the breach of this alleged duty, because the Groesbecks failed to demonstrate that Wal-Mart could identify the purchasers of the Bumbo Seat or devise a means of effectively communicating the post-sale danger. For the reasons explicated below, we uphold the district court's ruling.

We note at the outset that we are not aware of any Utah appellate case that has applied a post-sale duty to warn in the context of a product seller, and perhaps more importantly, the Groesbecks have not identified one. The district court relied in its analysis on a case from the District of Utah, *Herrod v. Metal Powder Products*, 886 F. Supp. 2d 1271 (D. Utah 2012), which did indicate that such a duty attaches under certain circumstances to manufacturers or sellers of products. *See id.* at 1277. However, in doing so, *Herrod* did not rely on Utah appellate authority directly supporting that proposition. Instead, it looked to another

30

federal case out of the District of Utah, *Dowdy v. Coleman Co.*, No. 1:11CV45DAK, 2011 WL 6151432 (D. Utah 2011) (unpublished).

*Dowdy* concluded that "the original seller" of the product at issue was subject to such a post-sale duty to warn, but it did so only by equating such sellers to a class of business entities that are clearly subject to such a duty under Utah law—that is, successor entities that acquire the assets of a predecessor business that produced or distributed an allegedly defective product. *Id.* at \*3 ("[T]he reasons for imposing a post-sale duty to warn in the successor context are the same as the reasons for imposing a continuing duty to warn on the original seller."); *see Tabor v. Metal Ware Corp.*, 168 P.3d 814, 818 (Utah 2007) (imposing "an independent post-sale duty *on successor corporations* to warn customers of defects in products manufactured and sold by the predecessor corporation") (emphasis added); *see also* RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 13 (Am. Law Inst. 1998) [hereinafter RESTATEMENT OF TORTS (THIRD)] (providing in certain circumstances that a "successor corporation or other business entity that acquires assets of a predecessor corporation or other business entity" may be "subject to liability for harm to persons or property caused by the successor's failure to warn of a risk created by a product sold or distributed by the predecessor").

"[W]hen an appeal presents an unsettled question of state law, we must ordinarily 'attempt to predict how [the] highest court would interpret [the

31

issue].'" *Belnap*, 844 F.3d at 1295 (quoting *Cornhusker Cas. Co. v. Skaj*, 786 F.3d 842, 852 (10th Cir. 2015)). However, "[a]s a federal court, we are generally reticent to expand state law without clear guidance from its highest court." *Taylor v. Phelan*, 9 F.3d 882, 887 (10th Cir. 1993); *accord Schrock v. Wyeth, Inc.*, 727 F.3d 1273, 1284 (10th Cir. 2013). This reticence causes us to decline to definitively opine in the first instance on whether a post-sale duty to warn applies under Utah law in the context of sellers like Wal-Mart: more specifically, we do not reach this question because we need not do so to resolve this case; even assuming *arguendo* such a duty does apply, the Groesbecks cannot prevail on their claim predicated on it. *See, e.g.*, *PDK Laboratories v. U.S. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part and concurring in the judgment) (noting that "if it is not necessary to decide more, it is necessary not to decide more"); *accord Valley Forge Ins. Co. v. Health Care Mgmt. Partners, Ltd.*, 616 F.3d 1086, 1094 (10th Cir. 2010).

As the guidepost for the post-sale "duty to warn standard" in the successor context, the Utah Supreme Court looked to the RESTATEMENT OF TORTS (THIRD). *See Tabor*, 168 P.3d at 818. We feel comfortable predicting that Utah's highest court would do so again, were it to define the relevant standard for such a duty in the context of a seller like Wal-Mart. *See Herrod*, 886 F. Supp. 2d at 1277 (applying the RESTATEMENT OF TORTS (THIRD) standard for a post-sale duty to warn in the seller context); *Dowdy*, 2011 WL 6151432, at \*3 (same). Thus, we

32

focus on section 10 of the RESTATEMENT OF TORTS (THIRD), which provides:

> (a) One engaged in the business of selling or otherwise distributing products is subject to liability for harm to persons or property caused by the seller's failure to provide a warning after the time of sale or distribution of a product if a reasonable person in the seller's position would provide such a warning.

> (b) A reasonable person in the seller's position would provide a warning after the time of sale if:

>> (1) the seller knows or reasonably should know that the product poses a substantial risk of harm to persons or property; and

>> (2) those to whom a warning might be provided can be identified and can reasonably be assumed to be unaware of the risk of harm; and

>> (3) a warning can be effectively communicated to and acted on by those to whom a warning might be provided; and

>> (4) the risk of harm is sufficiently great to justify the burden of providing a warning.

*Id.* § 10. The *Herrod* decision based its ruling on the section 10 standard, *see* 886 F. Supp. 2d at 1277; so, in turn, did the district court here.

That court determined that the Groesbecks failed to raise genuine disputes of material fact concerning the second and third elements. More specifically, the court noted that the Groesbecks "refer *only* to deposition testimony that Wal-Mart

could identify consumers who bought the Bumbo Seat online" but that this evidence was "irrelevant" because the Groesbecks purchased their seat in a brick-and-mortar Wal-Mart store. Aplts.' App., Vol. IX, at 2066 (emphasis added). Furthermore, the court found that the Groesbecks had offered "no evidence" that indicated such in-store posting "by Wal-Mart would sufficiently communicate the warning to Plaintiffs or any other similarly situated purchasers," nor had they presented authority to validate the effectiveness and legal sufficiency of such notice. *Id.*

Generally speaking, the district court's analysis with regard to the Groesbecks' post-sale duty to warn claim is persuasive. On appeal, however, the Groesbecks insist that they "did, in fact, present evidence with respect to warning consumers who purchased Bumbo Seats in Wal-Mart stores, and not just with respect to online purchasers." Aplts.' Opening Br. at 49. Insofar as the Groesbecks advance this argument to establish that the district court was wrong in finding that they cannot satisfy the second element of section 10, the record fatally undercuts their position. The Groesbecks did not argue before the district court that Wal-Mart could identify—and, thus, communicate with—consumers that previously had bought Bumbo Seats in its brick-and-mortar stores, much less present evidence to this effect. Their sole argument regarding the identification of prior Bumbo Seat purchasers in the district court was that "Wal-Mart could identify and communicate with customers who bought recalled products on line."

34

*See* Aplts.' App., Vol. VI, at 1240.  Furthermore, even at this late stage of the proceedings, the Groesbecks are apparently unable to identify any record evidence to support their view that Wal-Mart could identify those consumers who previously purchased Bumbo seats at brick-and-mortar Wal-Mart locations; notably, the citations in the Groesbecks' opening appellate brief relate to the online identification and communication argument that they previously made to the district court, and nothing more.

The Groesbecks do re-urge their argument that "Wal-Mart communicates product recalls to purchasers by posting the recall notices in the stores from which the product was purchased," and they reason that a "reasonable jury could infer from this evidence that Wal-Mart could have utilized the same method . . . to provide continuing warnings to those who purchased Bumbo Seats in Wal-Mart stores."  Aplts.' Opening Br. at 49–50.  However, even assuming that the Groesbecks have accurately described Wal-Mart's recall-notice practices, they fail to meaningfully engage with the district court's reasoning—*viz.*, they fail to explain why any such postings would be an effective communication device for product-defect warnings, and their argument is devoid of supportive legal authority.  Accordingly, the Groesbecks fare no better here than they did in the district court.

In sum, we conclude that the district court's entry of summary judgment

was appropriate on the Groesbecks' negligence claim against Wal-Mart for violation of the purported post-sale duty to warn.[11]

## 2

We next address the Groesbecks' argument that the district court erred in granting summary judgment on their negligence claims against Bumbo for design defect and failure to warn. Challenging the district court's decision, the Groesbecks raise essentially the same arguments and theories they asserted with regard to their strict-liability claims. We again reject these arguments, largely for the reasons set forth *supra*.

## a

Under Utah law, a negligence claim for design defect requires a duty of reasonable care owed to the plaintiff by the defendant, a breach of that duty which caused the claimed injuries, and resultant damages. *See Niemela*, 263 P.3d at 1198; *Slisze v. Stanley-Bostitch*, 979 P.2d 317, 320 (Utah 1999) (concluding that a plaintiff can "simultaneously bring a negligence and a strict liability claim," and applying the well-known negligence standard); *Barson ex rel. Barson v. E.R.*

---

[11] Because we discern no basis to sustain the Groesbecks' ordinary negligence claim against Wal-Mart, we likewise agree with the district court's entry of summary judgment on the Groesbecks' gross negligence claim. *See Pearce v. Utah Athletic Found.*, 179 P.3d 760, 767–68 (Utah 2008), *abrogated on other grounds by Penunuri v. Sundance Partners, Ltd.*, --- P.3d ----, 2017 WL 3697701 (Utah 2017) (explaining that gross negligence requires substantially more proof than ordinary negligence).

*Squibb & Sons, Inc.*, 682 P.2d 832, 835 (Utah 1984) (applying the traditional negligence analysis in a products-liability case). In assessing the existence of a duty of care, Utah courts consider: "(1) the extent that the manufacturer could foresee that its actions would cause harm; (2) the likelihood of injury; (3) the magnitude of the burden [borne from] guarding against [the harm]; and (4) the consequences of placing the burden on the defendant." *Slisze*, 979 P.2d at 320 (citing *AMS Salt Indus. v. Magnesium Corp. of Am.*, 942 P.2d 315, 321 (Utah 1997)); *see also Niemela*, 263 P.3d at 1198 (citing and applying the framework of *Slisze* and *AMS Salt Indus.*, and explaining a manufacturer's duty to eliminate any unreasonable risk of foreseeable injury).

Our disposition of the Groesbecks' strict-liability claim for design defect sounds the death knell of the Groesbecks' parallel negligence claim. Although the Utah Supreme Court recognized in *Slisze* that a product-liability plaintiff could simultaneously pursue negligence and strict-liability claims, the *Slisze* court emphasized that Utah law imposes "no duty to make a safe [product] safer," and does not "requir[e] manufacturers to discontinue manufacturing less safe but [still] non-defective products." 979 P.2d at 320 (first alteration in original) (quoting *Ruff v. Cnty. of King*, 887 P.2d 886, 891 (Wash. 1995)). Even more importantly, the *Slisze* court stressed that negligent design claims should be evaluated under the statutory standard for a strict-liability claim. *See Henrie*, 502 F.3d at 1236–37 (describing the overlapping inquiry under Utah law "between an

37

unreasonably safe design and a negligent design," and affirming the entry of summary judgment on negligence claims, because "there is no duty to make a safe product safer and because the [challenged product] was not defective under" the unreasonably dangerous analysis). Thus, a negligent design must also be an unreasonably dangerous design. *See id.*

The Groesbecks support their negligent-design claim exclusively on the (now-rejected) evidence used to support their strict-liability claims. Specifically, they press the theory that Bumbo acted negligently by manufacturing a product that created a foreseeable risk of injury. The Groesbecks' theory, however, amounts to little more than an argument that Bumbo negligently designed the Bumbo Seat given the availability of a safer alternative design, despite the Bumbo Seat's failure to meet the statutory standard for an "unreasonably dangerous" product. In other words, the Groesbecks urge us, contrary to *Slisze*, to impose a duty to make the Bumbo Seat safer. *Slisze*—as we have previously recognized—directly forecloses such reasoning. *See Henrie*, 502 F.3d at 1237 (noting that "because there is no duty [under *Slisze*] to make a safe product safer and because the fixture was not defective under the consumer expectation test in § 78–15–6, the district court correctly granted summary judgment" on the plaintiff's negligence claim); *Brown*, 328 F.3d at 1283 (applying *Slisze* to a negligent-design claim that mirrored the plaintiff's strict-liability claim, and affirming the district court's entry of summary judgment).

38

As a result, we conclude that the district court's entry of summary judgment was appropriate on the Groesbecks' negligence claim against Bumbo for design defect, and turn to the Groesbecks' negligence claim against Bumbo for failure to warn.

**b**

As with their negligent-design claim, the Groesbecks premise their negligent failure-to-warn claim on the same evidence as their strict-liability claim. Our conclusion under the strict-liability rubric therefore applies equally to the substantively identical negligence and gross-negligence claims. Stated succinctly, we conclude that the Groesbecks fail to raise a triable factual issue on their negligence and gross-negligence claim against Bumbo for failure to warn, because the warnings were adequate as a matter of law. For that reason, we conclude that the district court's entry of summary judgment was appropriate on the Groesbecks' negligence claim against Bumbo for failure to warn.

**IV**

Finally, we address our appellate jurisdiction over the Groesbecks's challenges to the district court's award of costs.

In the aftermath of the district court's summary-judgment decision, Bumbo and Wal-Mart sought an award of costs under Federal Rule of Civil Procedure 54(d). On October 6, 2015, the Groesbecks filed their Notice of Appeal from the

district court's summary-judgment decision, together with a separate opposition to the application for costs. The district court awarded $31,684.32 in costs, and the clerk of court entered a corresponding judgment on December 22, 2015. The Groesbecks, however, never filed a new or amended notice of appeal, nor do they address our jurisdiction in their appellate briefing. Rather, in their appellate briefing, the Groesbecks tacitly assume that we have jurisdiction over the costs award, and then challenge the award on its merits. We lack jurisdiction, however, over this aspect of the Groesbecks' appeal.

Federal Rule of Appellate Procedure 3(c)(1)(B) requires a notice of appeal to "designate the judgment, order, or part thereof being appealed," Fed. R. App. P. 3(c)(1)(B), and those designations circumscribe the scope of our appellate review, *see Cunico v. Pueblo Sch. Dist. No. 60*, 917 F.2d 431, 444 (10th Cir. 1990). Nevertheless, "our jurisdiction will not be defeated if other papers [like, a docketing statement or opening appellate brief] filed within the [thirty-day] time period for filing the notice of appeal provide the 'functional equivalent' of what Rule 3 requires." *Denver & Rio Grande W. R.R. Co. v. Union Pac. R.R. Co.*, 119 F.3d 847, 849 (10th Cir. 1997) (quoting *Torres v. Oakland Scavenger Co.*, 487 U.S. 312, 317 (1988)).

The underlying proceedings here plainly reveal that we lack appellate jurisdiction over the district court's award of costs. Simply stated, the

Groesbecks filed no new or amended notice of appeal following the district court's judgment of costs, and their opening brief (filed March 1, 2016) cannot be treated as the functional equivalent of a notice of appeal, because it came more than thirty days after the district court's judgment for costs (entered December 22, 2015). Accordingly, we lack jurisdiction to consider the costs award on appeal. See Fed. R. App. P. 4(a)(4)(B)(ii); *see also Art Janpol Volkswagen, Inc. v. Fiat Motors of N. Am., Inc.*, 767 F.2d 690, 697 (10th Cir. 1985) (explaining that a "separate notice of appeal is . . . required to obtain review" of an attorneys' fees determination that follows a judgment on the merits).

## V

Based on the foregoing, we **AFFIRM** the district court's judgment.


ENTERED FOR THE COURT


Jerome A. Holmes
Circuit Judge

41

# Appendix A



**WARNING** - Prevent Falls
Never use on any elevated surface



 **ENGLISH**

- As soon as your baby can support his/her own head, **Bumbo™** will help your baby sit in an upright position until your baby can sit unsupported.
- Use should be determined by baby's physical development.
- **Bumbo™** is soft, comfortable, lightweight and portable.
- **Bumbo™** is made from easy to clean, non toxic material.
*WARNING: Do not use on a raised or uneven surface, as a car seat, in a bath or in other wa*
*Do not use until your baby is fully able to support its head.*
*Depending on the physical development and age of the child, some babies will be able to move out of the Bumbo™, so never leave your child unattended.*

## English

**INSTRUCTION GUIDE - RETAIN FOR FUTURE USE**

**Bumbo Baby Seat**
The Bumbo Seat assists babies to sit upright.
Use this product:
- when babies can adequately support their own heads.
- on a safe, ground level surface.
- under adult supervision.
Clean with mild soap and water.

**WARNING**
Prevent falls, never use on any elevated surface.
Do not use:
- as a car or bath seat.
- in water.
- for prolonged periods.
Use responsibly, some babies may get out of this seat.
Never leave your baby unattended.





*See* Aplts.' App., Vol. II, at 316–19 (Bumbo's Mot. for Summ. J., filed Sept. 30, 2014).